633 P.2d 315

**STATE of Arizona, Appellee,**

v.

**Robert Wayne VICKERS, Appellant.**

No. 4765.

Supreme Court of Arizona,
In Banc.

June 1, 1981.

Rehearing Denied Sept. 10, 1981.

508

Robert K. Corbin, Atty. Gen., William J. Schafer, III, and Greg A. McCarthy, Asst. Attys. Gen., Phoenix, for appellee.

Michael F. Beers, Casa Grande, and Harry Bagnall, Coolidge, for appellant.

CAMERON, Justice.

Defendant, Robert Wayne Vickers, was convicted by a jury on 21 June 1979 of first degree murder in violation of A.R.S. § 13–1105(A)(1). Following an aggravation-mitigation hearing, defendant was sentenced to death pursuant to A.R.S. § 13–703. Defendant now appeals both conviction and sentence. We have jurisdiction pursuant to A.R.S. §§ 13–4031 and 13–4035.

Defendant raises seven issues on appeal:

1. Did the trial court improperly admit photographs of the corpse?
2. Were the statements made by defendant to Kent Spillman, a Psychology Associate II, improperly introduced into evidence?
3. Did the State present sufficient evidence to prove defendant sane beyond a reasonable doubt?
4. Did the trial court err in failing to instruct the jury on lesser included offenses?
5. Was defendant deprived of effective assistance of counsel?
6. Is former A.R.S. § 13–703, the death penalty statute in effect between 1 October 1978 and 30 April 1979 unconstitutional?
7. Was the death penalty properly imposed?

The facts necessary to a determination of these issues are as follows. Inmates Frank Ponciano and defendant had shared the same cell, F–9 in Cell Block 3 of the Arizona State Prison, for approximately a week and a half prior to 3 October 1978. On 3 October, defendant missed lunch because he overslept. When defendant got up he was angry with Ponciano because Ponciano had failed to wake him for lunch and had drunk defendant's Kool-Aid.

At 2:00 a. m. on 4 October 1978, a correctional officer made a check of the cells in Cell Block 3 and observed that defendant and Ponciano were awake. Correction Service Officer Neal Malone was making the 5:00 a. m. check when defendant attracted his attention. Defendant then stated, "Get

this stinking son of a bitch out of my cell." Asked what was wrong, defendant responded by sticking a lit cigar into the sole of one of Ponciano's feet, and by saying, "I think he died last night." Since Ponciano's body had not reacted to the burning cigar, Officer Malone ordered the defendant to remove the blanket covering Ponciano. The officer noticed numerous (10 to 12) puncture wounds in Ponciano's back and sides, and cuts in Ponciano's back spelling out the word "Bonzai," defendant's prison nickname. Officer Malone then informed his superiors of his situation.

When Officer Malone's superiors arrived, defendant was removed from the cell, strip searched, and placed in another cell. Ponciano's body was then examined in greater detail. Bruise marks encircled the neck, and the cuts and puncture wounds had bled only slightly. The body was warm to the touch. According to the autopsy report, the cause of Ponciano's death was manual and ligature strangulation.

Within the cell the officers found a strip of cloth torn from a sheet with a knot in it. A yellow toothbrush with the handle melted into a point and stained red was discovered in defendant's property box.

Sometime later in the morning of 4 October 1978, defendant was informed of his *Miranda* rights and interrogated. Defendant stated it was possible that he killed Ponciano, but that he remembered nothing about the killing. Defendant was reinterviewed on 16 October 1978 by the officers. Defendant admitted that the sight of blood made him feel good, and that he would kill any cellmate.

On 17 October 1978, defendant was indicted for the first degree murder of Frank Ponciano. After being found competent to stand trial, defendant was tried and convicted. Defendant was sentenced to death by Judge Robert R. Bean on 13 August 1979. Defendant now appeals both the conviction and sentence.

## PHOTOGRAPHS

Defendant asserts that three color photographs of Ponciano's body were im-

properly admitted into evidence because they were so gruesome as to inflame the passions of the jury. See *State v. Steele*, 120 Ariz. 462, 586 P.2d 1274 (1978); Rule 403, Arizona Rules of Evidence, 17A A.R.S. The first picture, Exhibit 16, showed the word "Bonzai" carved on the victim's back. The second picture, Exhibit 21, showed the bruises around the victim's neck where he had been strangled, and the third picture, Exhibit 24, showed the puncture marks on the side of the body. There was not a great deal of blood. The victim's face was not shown. Though in color and somewhat vivid, they were not particularly gruesome and, in our opinion, not so inflammable as to prejudice the average person. We have stated:

> "The admission or exclusion of photographs of murder victims is left to the trial judge's discretion. (citation omitted) As long as the photographs have probative value they are admissible, even though they may arouse the emotions of the jury. (citation omitted)" *State v. Gretzler*, 126 Ariz. 60, 86, 612 P.2d 1023, 1049 (1980).

Reasons for admission are to identify the victim, to illustrate how the crime was committed, to aid the jury in understanding testimony, and to show the location of wounds. *State v. Clark*, 126 Ariz. 428, 616 P.2d 888, cert. denied 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980); *State v. Ferrari*, 112 Ariz. 324, 541 P.2d 921 (1975).

In the present case, the photographs showed the location of wounds and illustrated how the crime was committed. Additionally, the trial judge excluded photographs that duplicated those admitted. But most importantly, the photographs aided the jury in determining the issue of defendant's sanity. Defendant relied on an insanity defense, specifically arguing that Ponciano was killed while defendant was suffering an epileptic seizure. A psychiatrist, Dr. Otto L. Bendheim, testified in the State's case-in-chief that while it is "possible" to strangle a person during an epileptic seizure, and possible though "unlikely" that an epileptic could stab the same person, it is

"inconceivable" that an epileptic in a seizure could write intelligible letters because writing is a "purposeful act." Thus, the most offensive of the photographs which showed the cuts in Ponciano's back aided the jury in determining whether the killing was done during an epileptic seizure. We find no abuse of discretion in the trial judge's ruling.

## DEFENDANT'S STATEMENTS TO THE PSYCHOLOGY ASSOCIATE II

Defendant asserts that the trial court improperly admitted statements made by defendant to Kent Spillman, a Psychology Associate II working at the Arizona State Prison. At approximately 3:30 p. m. on 4 October 1978, the day of the killing, Spillman conducted a mental status examination of defendant at the request of the institutional administrator of the prison.

At the beginning of the interview, defendant asked Spillman if the interview was being taped. Spillman showed defendant an unplugged tape recorder and informed him that it would be illegal to tape the interview. Apparently reassured, defendant described the murder of Ponciano to Spillman.

Spillman testified to the ensuing conversation at trial:

"A * * * And then I asked him [defendant] if he killed him and he said—

"Q When you said: Killed him, who are you talking about?

"A Mr. Ponciano.
And he said: Do you mean premeditated?
And I said: Yes.
He smiled and said: Yes, and then he went on—

     *     *     *     *     *     *

"A Yes, then he went on to describe how he killed Mr. Ponciano."

Defendant stated he was mad at the victim because the victim did not awaken the defendant for lunch and because the victim drank defendant's Kool-Aid. Defendant told how he "got things ready" after the guard made the 3:30 a. m. walk through,

how he made the garrote from the torn bed sheet, and how he choked the victim and stabbed him. Spillman testified further:

"I asked him if he remembered writing his nickname on the back of Mr. Ponciano and he said: No. But later on sometime he said: I didn't have time to put a swastika on."

Defendant contends that admitting the statements made to Spillman was error for two reasons. First, defendant asserts the statements were confidential communications protected by the physician-patient privilege. Second, defendant asserts that Spillman's failure to inform defendant of his constitutional rights violates *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

a. The physician-patient privilege

At trial, defendant did not object to the introduction of Spillman's testimony on the basis of privilege, but rather limited the grounds of his objection to the failure in giving *Miranda* warnings. While we have stated that "raising one objection at trial does not preserve another objection on appeal," *State v. Long*, 119 Ariz. 327, 328, 580 P.2d 1181, 1182 (1978), we will consider a matter on appeal not raised below if it is a matter of fundamental error. As to the admission of statements made to a psychiatrist appointed by the court to determine if a defendant was competent to stand trial, we have stated:

"Although the defendant made no objection to the introduction of the evidence, we believe that something more is required. The record must affirmatively show that the defendant did, in fact, consent to the introduction of this evidence. " * * * To allow this information to be admitted without defendant's consent would have a chilling effect on the honest and free flow of information between the doctor and patient *while the patient is being examined as to his competency to stand trial.*" *State v. Magby*, 113 Ariz. 345, 351, 554 P.2d 1272, 1278 (1976). (emphasis supplied)

If Spillman had been a psychiatrist and was examining defendant for competency, the privilege would apply. *Magby, supra.* Spillman was not a psychiatrist. He was a psychologist employed by the Department of Corrections and worked at the Arizona State Prison. A graduate in psychology with a Masters Degree in Counselling Psychology, he described himself as a Psychologist Associate or "like a junior psychologist."

"Q  And what is your primary job out there?

"A  Doing individual group therapy evaluations.

Up until about three months ago, I was in charge of kind of sending people back and forth between the Arizona State Hospital and the Alhambra unit of the prison."

And as to defendant Vickers, he testified:

"I was asked by the institutional administrator at that time, Mr. Burd, to interview the inmate. Usually we get a specific kind of referral question. There was none at the time so it was kind of a mental status examination.

"I guess they were wondering, you know, if he was crazy, if he should be on the same grounds or whatever."

The physician-patient privilege is created by statute in Arizona:

"A person shall not be examined as a witness in the following cases:

\*      \*      \*      \*      \*      \*

"4. A physician or surgeon, without consent of his patient, as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient." A.R.S. § 13–4062(4).

Spillman is not a medical doctor, but a Psychologist Associate II. While there is some authority that a "licensed psychologist" can be a "physician" under A.R.S. § 13–4062(4), the record is devoid of any evidence that Spillman is a "licensed psychologist." See A.R.S. § 13–3993(C). We believe that a privileged relationship did not exist between defendant and Spillman.

b.  *Miranda* warnings

Spillman's interview with defendant was a mental status examination. This interview was conducted at the direction of prison officials to determine the course of events that resulted in the death of Frank Ponciano earlier that day. The State contends that Kent Spillman was a "civilian" and not a correctional service officer. It is clear, however, that Spillman was an employee of the prison and represented prison authority. In effect, he was a law enforcement or correctional service officer conducting a custodial interrogation of defendant. *Miranda v. Arizona, supra.* Since Spillman failed to give the defendant the *Miranda* warnings, the defendant's statements were inadmissible during the State's case-in-chief. Defendant's statements are not, however, inadmissible for all purposes.

The defendant took the stand in his own defense. On direct examination, defendant testified that he did not remember the events in his cell during the early morning hours of 4 October 1978. This testimony was consistent with the insanity defense propounded by defendant. On cross-examination, defendant was questioned concerning the statements made to Spillman. Defendant denied making the statements and accused Spillman of fabricating the statements in order to get "points" with the prison administration.

The State called Spillman as a rebuttal witness, not as a witness in its case-in-chief. The statements were reliable and were properly admitted to impeach defendant's credibility. *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *State v. Dixon,* 15 Ariz. App. 62, 485 P.2d 1179 (1971). Additionally, the statements were properly admitted to rebut defendant's insanity defense which was premised on defendant's lack of memory concerning his behavior on 4 October 1978. We find no error in the admission of the statements made by defendant to Spillman.

## EVIDENCE OF SANITY

Defendant argues that the trial court erred in failing to direct a verdict of acquittal because the State failed to present sufficient evidence to prove defendant sane beyond a reasonable doubt.

In the State's case-in-chief, several correctional service officers, Neal Malone, Richard Rovers, and Henry Summers, testified that on the morning of 4 October 1978, defendant appeared to understand what was said to him, obeyed orders directed to him by the officers, and acted in the same manner as usual. Dr. Otto L. Bendheim, a psychiatrist who examined defendant's mental status at the time of the killing of Frank Ponciano, testified for the State. Dr. Bendheim stated that he "found nothing that would indicate to me that the man was insane or psychotic or unaware of his actions or his conduct at that time." Although Dr. Bendheim testified that defendant might be an epileptic, he also testified that it was "inconceivable" that defendant could write intelligible letters on the back of Frank Ponciano during a seizure.

Several inmates were called by the defense. Steven Carter, Charles Black, Gary Lewallen, and John Huey, each testified that defendant was subject to uncontrollable fits of violence. The inmates also stated that defendant would imagine alligators and police when neither were present. Defendant took the stand in his own defense and testified that he was an epileptic, that on occasion he would lose control of himself when he got angry, and did not remember the events of 4 October 1978. Dr. Paul M. Bindelgles, a psychiatrist who testified for the defense, stated that defendant may have been suffering an epileptic seizure at the time of the killing. In Dr. Bindelgles' opinion such a seizure would have prevented defendant from knowing the difference between right and wrong.

In rebuttal, the State called a certified specialist in both neurology and psychiatry, Dr. Maier I. Tuchler. Dr. Tuchler testified as follows:

"Q And he understood the difference between right and wrong, or he would have at that time?

"A I felt that he understands now and understood then the distinction between right and wrong. * * *

"Q And did you evaluate him, or are you aware of any problems that he may have with epilepsy?

"A I did not feel he had any problem with epilepsy or a seizure disorder.

"Q If it was determined that he was subject to epileptic seizures, could that possibly have accounted for his actions at the time of the event?

"A I do not think so."

A defendant is presumed sane, but once a defendant raises the issue of his sanity, the State has the burden of showing the defendant is sane beyond a reasonable doubt. *State v. Glasco*, 124 Ariz. 454, 605 P.2d 33 (1980); *State v. Moore*, 111 Ariz. 496, 533 P.2d 663 (1975). For the trial court to direct a verdict of acquittal because of the failure of the State to prove defendant's sanity, the court must find that from the evidence, reasonable men would have a reasonable doubt as to defendant's sanity at the time of the offense. *State v. Ganster*, 102 Ariz. 490, 433 P.2d 620 (1967).

We believe the State introduced substantial evidence of defendant's sanity at the time of Ponciano's killing, and that reasonable persons would not necessarily have a reasonable doubt as to defendant's sanity. *State v. Jones*, 125 Ariz. 417, 610 P.2d 51 (1980); *State v. Ganster*, supra. The trial court properly denied defendant's motion for a directed verdict.

## INSTRUCTION ON LESSER INCLUDED OFFENSE

Defendant contends that the trial court erred in failing to instruct the jury on a lesser included offense, second degree murder. A.R.S. § 13–1104. Defendant failed to object at trial to the absence of a second degree murder instruction. Rule 21.3(c) of the Rules of Criminal Procedure, 17 A.R.S., provides that a party may not assign as error the failure to give an instruction un-

less he objects before the jury retires. This rule change reversed a previous decision of this court, *State v. Madden*, 104 Ariz. 111, 449 P.2d 39 (1969), which held that the trial judge, in homicide cases, had to instruct on all lesser included offenses supported by the evidence even if not requested by the defendant. See *State v. Ceja*, 113 Ariz. 39, 546 P.2d 6 (1976).

However, the United States Supreme Court has recently stated that the death penalty may not be imposed when the jury is not permitted to consider lesser included non-capital offenses when the evidence would have supported such a verdict. *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). We believe that the Comment to Rule 21.3, supra, continues to reflect the law in Arizona as to non-capital offenses. As to potential death penalty cases, the trial judge will be required to instruct on lesser included offenses if supported by the evidence, even if not requested by the defendant. *Beck*, supra. This does not mean that we will have to reverse in the instant case, as we believe that even if the defendant had requested a lesser included offense instruction, the trial court would not have been required to give such instruction.

Second degree murder is a killing under certain defined circumstances without premeditation. A.R.S. § 13–1104.

> "* * * To support an instruction for second degree murder, the evidence reasonably construed should tend to show lack of premeditation. (citation omitted) The presence of such evidence is dispositive." *State v. Moreno*, 128 Ariz. 257, 261, 625 P.2d 320, 324 (1981).

Our criminal code provides:

> " 'Premeditation' means that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion." A.R.S. § 13–1101(1).

Vickers defended on the grounds of insanity, and the facts indicate he was guilty of first degree murder or not guilty of any offense. If the defendant was sane, then the killing was premeditated—the tearing of the bed sheets to form a garrote and the time it took to choke the victim to death indicates time to reflect, and premeditation. Even the later stabbing and the carving of defendant's nickname on the victim's back, though after the victim may have died, indicates an intentional, knowledgeable, and reflective act on the part of the defendant. The defendant did know the difference between right and wrong, and the evidence showed that the killing was a deliberate and reflective act and could only be first degree murder. *State v. Malumphy*, 105 Ariz. 200, 461 P.2d 677 (1969); *State v. Schroeder*, 95 Ariz. 255, 389 P.2d 255, cert. denied 379 U.S. 939, 85 S.Ct. 347, 13 L.Ed.2d 350 (1964).

Defendant contends, however, that evidence of defendant's "violent fits of temper in which he would lose control of himself" tends to show lack of premeditation. We do not agree. Even if we admit that the defendant was in a rage when he killed the victim, the other uncontested facts show the opportunity to reflect or premeditate. In the instant case, the defendant, while cutting the garrote from the bed sheet and taking the time to strangle a person, had every opportunity to reflect and premeditate. The trial judge did not err in instructing only on first degree murder. *State v. Malumphy*, supra; *State v. Schroeder*, supra.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends he was denied effective assistance of counsel because his trial attorney emphasized defendant's past history of violence. The emphasis placed on defendant's prior violent acts was an attempt to show a continuing pattern of irrational behavior on the part of defendant. As such, defendant's prior acts of violence were supportive of the insanity defense propounded by counsel. Considering that

there were only two men in the cell and one was killed, it is a reasonable inference that the other was the killer. Defendant's emotional state was one of the few arguments that defendant's attorney could logically present with any hope of success. "Matters of trial strategy and tactics are committed to defense counsel's judgment, and claims of ineffective assistance cannot be predicated thereon." *State v. Streett,* 11 Ariz.App. 211, 215, 463 P.2d 106, 110 (1969); see *State v. Rodriguez,* 126 Ariz. 28, 612 P.2d 484 (1980); *State v. Dippre,* 121 Ariz. 596, 592 P.2d 1252 (1979). After examining the entire record, we find that defendant was not denied effective assistance of counsel.

## CONSTITUTIONALITY OF THE DEATH PENALTY IN EFFECT BETWEEN 1 OCTOBER 1978 AND 30 APRIL 1979

■ The offense which is the subject of this appeal occurred on 4 October 1978. Former A.R.S. § 13–703, in effect between 1 October 1978 and 30 April 1979, was the death penalty statute at that time. This statute was amended prior to the aggravation-mitigation hearing which was conducted on 24 July 1979.

The trial judge conducted the aggravation-mitigation hearing pursuant to not only § 703, in effect at the time of the offense, but also pursuant to *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978), cert. denied 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979) and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The new version of A.R.S. § 13–703 effectively incorporated the provisions of *Watson,* supra, and *Lockett,* supra, as far as the aggravation and mitigation hearing is concerned. Thus, defendant was sentenced to death pursuant to former § 703 and *Watson* and *Lockett,* supra.

Defendant contends, however, that former § 703 is unconstitutional because it limits the showing of mitigating circumstances in violation of *Lockett v. Ohio,* supra. Former § 703 is almost identical to former A.R.S. § 13–454. The only differences are the additions in former § 703 of an introductory subsection, a seventh aggravating circumstance, and a fifth mitigating circumstance. Because former § 703 is identical in all material respects to § 454, we hold that *State v. Watson,* supra, and subsequent decisions on the constitutionality of § 454, are controlling in determining the constitutionality of § 703. The trial court followed *Watson,* supra, and *Lockett,* supra, in imposing sentence. We find no error.

■ Defendant contends that applying *Watson* to former § 703 will result in the creation of a judicially enacted penalty. The argument was rejected by this court in *State v. Mata,* 125 Ariz. 233, 609 P.2d 48, cert. denied 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980). The defendant also asserts that the death penalty per se constitutes cruel and unusual punishment, but this court has ruled to the contrary. *State v. Madsen,* 125 Ariz. 346, 609 P.2d 1046, cert. denied 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980).

## IMPOSITION OF THE DEATH PENALTY

■ Our duty on review of the death penalty is to conduct an "independent examination of the record to determine whether the death penalty was properly imposed." *State v. Ceja,* 115 Ariz. 413, 415, 565 P.2d 1274, 1276, cert. denied 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977).

### a. Aggravating circumstances

The trial judge found four aggravating circumstances:

"1. The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable.

"2. The defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person.

\* \* \* \* \* \*

"6. The defendant committed the offense in an especially heinous, cruel or depraved manner.

"7. The defendant committed the offense while in custody of the department of corrections, a law enforcement agency or county or city jail." Former A.R.S. § 13–703(F).

As to the aggravating circumstances set out in paragraphs 1, 2, and 7, we find that they were adequately shown. Defendant had a prior conviction for assault with a deadly weapon. Former A.R.S. § 13–249. It is uncontested that defendant was previously convicted of an offense in which a life or death sentence was imposable and which involved the threat of violence to another. Defendant was an inmate at the Arizona State Prison when Ponciano was murdered. The defendant, therefore, "committed the offense while in custody of the department of corrections." Former A.R.S. § 13–703(F)(7).

Defendant objects only to the trial court's finding that the offense was committed in an especially heinous cruel or depraved manner. Former A.R.S. § 13–703(F)(6). In applying this provision of our death penalty statute, we have stated:

"The words 'heinous, cruel or depraved' have meanings that are clear to a person of average intelligence and understanding. Webster's Third New International Dictionary defines them as follows:

heinous: hatefully or shockingly evil: grossly bad

cruel: disposed to inflict pain esp. in a wanton, insensate or vindictive manner: sadistic

depraved: marked by debasement, corruption, perversion or deterioration.

" * * * What our legislature intended to include as an aggravating circumstance was a killing wherein additional circumstances of the nature enumerated above set the crime apart from the usual or the norm." *State v. Knapp,* 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977), cert. denied 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978).

Evidence supporting a finding that one or more of these aggravating conditions were present will be sufficient to find an aggravating circumstance under former A.R.S. § 13–703(F). *State v. Ceja,* supra.

Defendant's actions subsequent to the death of Ponciano indicate that the offense was committed in an especially depraved manner. The numerous stabbings, the carving of the word "Bonzai" in Ponciano's back, reflect a mental state that is "marked by debasement," and thus aggravating circumstance number 6 was shown. We find no error.

### b. Mitigating circumstances

The trial judge found no mitigating circumstances. Defendant argues that the following mitigating circumstance was established:

"The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." Former A.R.S. § 13–703(G)(1).

The psychiatric testimony offered by defendant, and substantiated by the State's experts, characterized defendant as a sociopathic-psychopathic personality. In *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), cert. denied 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977), we held that character disorders cannot be used to establish mitigation.

"The psychiatric testimony offered by the defendant characterized him as a sociopath, that is, a person with a character or personality disorder. The threshold question presented is whether a character or personality disorder qualifies as an impairment within the meaning of A.R.S. § 13–454(F)(1). We believe it does not." *State v. Richmond,* supra, 114 Ariz. at 197, 560 P.2d at 52.

The trial court was correct in finding that mitigating circumstances based upon A.R.S. § 13–703(G)(1) did not exist. In *State v. Watson,* supra, however, we held that all mitigating circumstances must be considered before imposing the death penalty. The defendant then may present additional evidence to show that the "disorder"

is capable of significantly impairing a person's capacity. See *State v. Jordan*, 126 Ariz. 283, 614 P.2d 825, cert. denied 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980). These available circumstances may be considered by the trial judge prior to the imposition of sentence, even though they do not comply with A.R.S. § 13–703(G)(1). In the instant case, the trial court heard and considered this mitigating circumstance even if it did not make a specific finding. *Watson*, supra; *Lockett*, supra, require that evidence of any mitigating circumstance must be heard and considered. These cases do not require a statement that they have not been found.

The evidence presented by defendant established only that a character disorder existed, not that the disorder influenced his behavior and impaired his capacity on the night Ponciano was murdered so as to constitute a mitigating circumstance.

 Defendant further contends that prison officials bear some responsibility for the murder of Ponciano, and that this factor should be considered in mitigation. Defendant argues that since prison administrators housed defendant with Ponciano, knowing the defendant's history of violence, prison officials created a situation in which a murder would occur. While the evidence shows that prison officials might have been aware of the danger defendant posed, the evidence also discloses that defendant and Ponciano made independent requests to prison officials to share a cell. We do not believe that this is a mitigating circumstance.

Defendant was twenty years of age at the time of the murder. We believe that defendant's age was a mitigating circumstance and so find. See former A.R.S. § 13–703(G)(5). We do not believe, however, that the evidence shown by the defendant, even if it justified findings of additional mitigating circumstances, counterbalances the four aggravating circumstances. After reviewing the record and making an independent determination of the aggravating and mitigating circumstances, and weighing them against each other, we do not find the mitigating circumstances "sufficiently substantial to call for leniency." Former A.R.S. § 13–703(E); see *State v. Steelman*, 126 Ariz. 19, 612 P.2d 475, cert. denied 449 U.S. 913, 101 S.Ct. 287, 66 L.Ed.2d 141 (1980).

The judgment of guilt and sentence of death are affirmed.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and GORDON, JJ., concur.