885 P.2d 1086

**STATE of Arizona, Appellee,**

v.

**Robert Wayne VICKERS, Appellant.**

**No. CR–90–0260–AP/PC.**

Supreme Court of Arizona,
En Banc.

Dec. 6, 1994.

522

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals Section, Galen H. Wilkes, Asst. Atty. Gen., Phoenix, for appellee.

Dennis H. Gray, P.C. by Dennis H. Gray, Tucson, for appellant.

## OPINION

CORCORAN, Justice.

On November 30, 1989, a Pinal County jury convicted appellant Robert Wayne Vickers (defendant) of premeditated first-degree murder. After an aggravation/mitigation hearing, the trial court sentenced defendant to death. Defendant's conviction and death sentence are automatically appealed to this court. *See* A.R.S. § 13–4033; rules 26.15, 31.2(b), and 31.15(a)(3), Arizona Rules of Criminal Procedure. In addition, defendant seeks review of the trial court's denial of his

petition for post-conviction relief. *See* rule 32.9(c), Arizona Rules of Criminal Procedure.

We granted review of the denial of defendant's petition for post-conviction relief and consolidated it with his automatic appeal. *See* rule 31.4(b)(2), Arizona Rules of Criminal Procedure. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031, –4033, and –4035. Because we find that defendant received ineffective assistance of counsel, we reverse his conviction and remand this case for retrial.

### ISSUES PRESENTED

Although defendant raises a number of issues in his brief, because of the disposition of this case, we address only the following two:

1. Was defendant denied effective assistance of counsel?

2. Did the trial court err in denying defendant's motion to dismiss based on the destruction of all physical evidence relating to this case?

### FACTUAL AND PROCEDURAL HISTORY

#### I. The Underlying Offense

Defendant and the victim, Frank Ponciano, had been cellmates at the Arizona State Prison for approximately a week and a half before Ponciano's murder. On October 3, 1978, defendant missed lunch because he overslept. When he awoke, defendant was angry with Ponciano for failing to awaken him for lunch and for drinking his Kool–Aid.

At approximately 5:00 a.m. on October 4, Officer Neal Malone was doing his usual "security walk" when defendant summoned him to defendant and Ponciano's cell. As Officer Malone approached, he saw someone lying on the lower bunk covered with a blanket from head to toe. Defendant said, "Get this stinking son of a bitch out of my cell. I think he died last night." Defendant then lifted the blanket and put the lit end of his cigar against the sole of Ponciano's foot. When Ponciano did not react, Officer Malone had defendant remove the blanket that had been covering Ponciano. Officer Malone ob-

served that the word "Bonzai" had been cut into Ponciano's back. Ponciano also had been stabbed numerous times.

Shortly thereafter, Sergeant Richard Rovers arrived on the scene. He immediately entered the cell and checked the body, which was still warm in most places. Defendant was removed from the cell and strip searched, but no weapon was found on him. Officer Henry Stuhmer, who was present during the strip search, noted that there were no scratches, bruises, blood, or any other signs of a struggle on defendant's body. In addition, Officer Malone later testified that defendant did not seem "unusual" at the time, and he did not appear nervous or frightened.

Meanwhile, correctional officers searched defendant and Ponciano's cell. The officers found strips of a torn bed sheet that had been tied together with a knot. In a box labelled "Vickers," they also found a yellow toothbrush that had been fashioned into a weapon. Specifically, one end of the toothbrush had been curled into a loop and the other end had been filed down to a point. Officer Stuhmer observed some red stains and a hair on the toothbrush handle.

After the search of defendant's cell was complete, Detective Tom Solis interviewed defendant. Before the interview, defendant was advised of his *Miranda* rights. Initially, defendant maintained that he did not know what happened to Ponciano. Eventually, however, he said that "he might have done it," but that "he could not remember." Defendant claimed that he had had bad dreams all night, and when he awoke, he saw that Ponciano had stab wounds and "Bonzai" cut into his back. During the course of the interview, however, defendant admitted that he had considered "killing his cell partner, any cell partner" and that Ponciano had angered him by drinking his Kool–Aid.

Later that day, Kenneth Spillman, a psychology associate employed by the Department of Corrections, conducted a mental status examination of defendant. Spillman did not give defendant *Miranda* warnings before interviewing him. At the beginning of the interview, defendant reiterated most of what he told Detective Solis. But after defendant

learned that Spillman was not tape-recording the conversation, he became much more talkative. When Spillman directly asked defendant whether he had killed Ponciano, defendant admitted that he had and that it was "premeditated."

Defendant further stated that, after the 3:30 a.m. security check on October 4, he began preparing to kill Ponciano. He admitted that he made a garrote out of a bed sheet, and he then described in detail how he strangled and stabbed Ponciano. Thomas Jarvis, M.D., performed the autopsy on Ponciano and determined that the cause of death was manual and ligature strangulation. Basically, Dr. Jarvis's conclusions regarding the cause of death were consistent with the description of the murder that defendant gave to Spillman.

## II. Procedural History

In June 1979, defendant was tried before a jury and convicted of first-degree murder. Pinal County Superior Court Judge Robert R. Bean sentenced defendant to death. Defendant appealed his conviction and his sentence, and this court affirmed both in June 1981. *See State v. Vickers,* 129 Ariz. 506, 633 P.2d 315 (1981) (*Vickers I*). After the United States District Court denied defendant's petition for habeas corpus relief, defendant appealed the denial to the United States Court of Appeals for the Ninth Circuit.

In August 1986, the Ninth Circuit issued its opinion in *Vickers v. Ricketts,* 798 F.2d 369 (9th Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 980 (1987). Because some of the evidence presented at trial indicated that defendant might have killed Ponciano as a result of a "sudden and impulsive" act, and because the trial court failed to instruct the jury on second-degree murder, the court reversed the district court's denial of defendant's petition for a writ of habeas corpus, set aside defendant's conviction, and remanded the case for retrial.

Defendant was retried in November 1989 and again was convicted of first-degree murder. After conducting an aggravation/mitigation hearing and finding that the mitigating circumstances were not sufficiently sub-

stantial to call for leniency, Pinal County Superior Court Judge Franklin D. Coxon sentenced defendant to death. Defendant filed with the trial court a notice of appeal and a petition for post-conviction relief, pursuant to rule 32, Arizona Rules of Criminal Procedure. The trial court scheduled a rule 32 hearing, and defendant's direct appeal was stayed pending the outcome of the proceedings. After conducting the rule 32 hearing, the trial court denied relief. As stated above, we granted review of the denial of defendant's motion for post-conviction relief and consolidated it with his direct appeal.

## III. Facts Relevant to Petition for Post-Conviction Relief

In April 1988, after representing defendant for almost a year, Thomas Cole moved to withdraw from representation. The trial court granted the motion and appointed Kirk Karman to represent defendant. In April 1989, Karman associated Ralph Malanga to assist in defendant's representation. Shortly thereafter, a disagreement arose between the two, and Karman fired Malanga. After Malanga filed a motion informing the court that he had been privately retained by defendant, the trial court allowed Karman to withdraw from representation and set the trial for May 23, 1989.

A few days before the scheduled trial date, Malanga moved for a continuance, claiming that he needed to interview more than 100 witnesses and possibly a "number of experts." He subsequently made numerous motions to the court requesting additional time to interview witnesses and/or conduct further investigations. The court granted these motions in an attempt to allow Malanga adequate time to prepare for trial.

On October 31, 1989, however, the state filed a motion to determine counsel claiming that Malanga had been "derelict in his duties [to defendant] to the point of ineffective assistance." The motion contained a number of specific allegations, the most important of which were that Malanga had failed to: (1) interview any of the state's witnesses, (2) visit the murder scene, (3) review the victim's Department of Corrections file, (4) review certain potential exhibits, and (5) hire an investigator to help prepare for trial. After hearing argument from both sides, the trial court denied the motion.

At defendant's retrial, Malanga advanced a conspiracy defense in which he implied that defendant had been framed for Ponciano's murder by the Department of Corrections. Moreover, notwithstanding this court's earlier determination that defendant's statements to Spillman were inadmissible during the state's case-in-chief, *Vickers I*, 129 Ariz. at 511, 633 P.2d at 320, Malanga withdrew prior counsel's motion to suppress and allowed Spillman to be called as a witness by the state. His purported reason for doing so was his belief that he could elicit testimony on cross-examination that would bolster the conspiracy defense. When Spillman testified, however, he gave a detailed account of his conversation with defendant, including defendant's admission that he had killed Ponciano, as well as defendant's graphic description of how he had planned and carried out the murder. Defendant did not testify in his own behalf. Not surprisingly, the jury found defendant guilty of first-degree murder.

Although the trial court scheduled an aggravation/mitigation hearing for December 19, Malanga subsequently made several motions to continue the hearing. On February 14, 1990, the state filed a motion in limine to have co-counsel appointed to represent defendant because Malanga had been sentenced to 30 days in jail for contempt in an unrelated proceeding. Dennis H. Gray was appointed to serve as co-counsel, and the hearing was rescheduled for March 30.

Malanga appeared at the first scheduled status conference on March 26, but he virtually disappeared from that point forward. The court, the prosecutor, and Gray made numerous attempts to contact Malanga regarding court matters, but for the most part, they were unsuccessful.

On May 30, Gray filed a motion for investigation based upon rumors that Malanga had abused both drugs and alcohol during trial. Judge Coxon treated the motion as a petition for post-conviction relief, and he issued a show cause order requiring Malanga to appear at the rule 32 hearing scheduled for

July 10. Malanga appeared as required on July 10 and withdrew from representation at defendant's request. The trial court appointed Gray to represent defendant in all further proceedings.

Malanga neither appeared at nor testified during the subsequent rule 32 proceedings. Gray presented several witnesses, however, who testified regarding Malanga's drug and/or alcohol use during trial. One individual who worked as an investigator for Malanga during the summer of 1989 testified that Malanga occasionally would consume alcohol and/or cocaine before court appearances. Moreover, at least 4 different witnesses testified that they smelled alcohol on Malanga's breath during trial. And, finally, both the state's expert witnesses, Michael Vance, M.D., and defendant's expert witness, John Davis Palmer, M.D., concluded that Malanga likely was using cocaine during trial.

In denying defendant's petition for post-conviction relief, the trial court concluded that Malanga "consumed some alcohol" and "may have used cocaine" during trial, but he "was not deficient nor did his performance as such prejudice [the] defense."

## DISCUSSION

### I. Ineffective Assistance of Counsel

Defendant maintains that he was denied his right to effective assistance of counsel at trial. U.S. Const. amend. VI. Based upon our review of the record, we agree.

■ In deciding whether a conviction should be reversed on grounds of ineffective assistance of counsel, we apply a two-pronged test. Specifically, defendant must show that: (1) counsel's performance was deficient, as defined by prevailing professional norms; and (2) the deficient performance resulted in prejudice to the defense. *See State v. Nash,* 143 Ariz. 392, 397, 694 P.2d 222, 227, *cert. denied,* 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985); *State v. Lee,* 142 Ariz. 210, 689 P.2d 153 (1984); *see also Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Although defendant lists several acts and omissions which he claims exemplify Malanga's ineffectiveness, rather than addressing each

alleged error, we limit our discussion to those critical to our determination.

### A. *Alleged Drug and Alcohol Abuse*

■ Defendant relies heavily on Malanga's alleged drug and alcohol abuse during trial to establish his claim of ineffective assistance of counsel. But this fact, "standing alone, does not establish a per se violation of a criminal defendant's right to receive effective assistance of counsel." *State v. D'Ambrosio,* 156 Ariz. 71, 73, 750 P.2d 14, 16 (1988). Generally, there must be some additional showing of a causal connection between counsel's drug and/or alcohol use and the alleged errors at trial. *D'Ambrosio,* 156 Ariz. at 73–74, 750 P.2d at 16–17.

We agree that defendant presented ample evidence to indicate that Malanga likely was using drugs and/or alcohol during court proceedings. Although expert witnesses could not state with any degree of certainty that Malanga's actions at trial were affected by alcohol and/or drug use, in this case we need not determine whether such a causal connection exists. Notwithstanding the allegations of substance abuse, we find that Malanga's errors at trial provide independent support for defendant's ineffective assistance of counsel claim. We therefore turn to specific acts and omissions advanced by defendant in support of his ineffective assistance of counsel claim.

### B. *Decision to Advance a Conspiracy Defense and to Allow Kenneth Spillman to Testify During the State's Case-in-Chief*

■ Defendant argues that Malanga's decision to advance a conspiracy defense and his decision to allow Kenneth Spillman to testify during the state's case-in-chief constituted errors so egregious that they alone support a claim of ineffective assistance of counsel. In response, the state maintains that Malanga's decision to allow Spillman to testify was a tactical one consistent with his decision to advance a conspiracy defense, and therefore, these decisions cannot support an ineffective assistance of counsel claim.

Ordinarily, we would agree with the state's position. We realize that our "scrutiny of [defense] counsel's performance must be highly deferential." *Nash*, 143 Ariz. at 398, 694 P.2d at 228, quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. As such, we have repeatedly acknowledged that "disagreements in trial strategy will not support a claim of ineffective assistance of counsel, provided the challenged conduct had some reasoned basis." *State v. Nirschel*, 155 Ariz. 206, 208, 745 P.2d 953, 955 (1987); *see also State v. Smith*, 158 Ariz. 222, 231, 762 P.2d 509, 518 (1988); *State v. Sammons*, 156 Ariz. 51, 56, 749 P.2d 1372, 1377 (1988). Our review of the record in this case, however, leads us to the inescapable conclusion that neither the decision to advance a conspiracy defense nor the decision to allow Spillman to testify had a "reasoned basis."

As Gray testified during the rule 32 proceedings, Malanga admitted to him that there was absolutely no evidence to support a conspiracy defense. Moreover, as we determined in *Vickers I*, defendant's statements to Spillman were inadmissible during the state's case-in-chief. 129 Ariz. at 511, 633 P.2d at 320. The statements were properly admitted during defendant's first trial only because Spillman was called by the state as a rebuttal witness after defendant took the stand and denied making any statements to Spillman. *Vickers I*, 129 Ariz. at 511, 633 P.2d at 320. At his retrial, however, defendant did not testify on his own behalf; therefore, the state could not have called Spillman as a witness had Malanga not withdrawn the motion to suppress. As such, we are unable to conceive of any logical basis for allowing Spillman to testify. The testimony itself, which was nearly identical to that given at defendant's first trial, best illustrates this point:

Q: At any time did you ask [defendant] directly if he killed his cellmate?

A: I said did you kill him. And then he said you mean premeditated? And I said yes. He smiled and said yes. He then described in detail how he killed Ponciano.

Q: Who supplied the word "premeditated"?

A: He did.

Q: Had you mentioned the word premeditated at any time in the conversation up until then?

A: No. No.

. . . .

A: Then [defendant] had mentioned that when he let Ponciano go, he made some rasping noises and he thought he might not be dead. He reported jumping on Ponciano's back and stabbing him in the neck. He said it didn't bleed much and explained once the heart stops and you cut someone, they don't bleed much. He described stabbing him in the back and how difficult it was and the crunching noise it made. He said he thought about jumping on the knife. Then he stabbed him again and this time the knife went in easily and there was noise like escaping air and he thought he must have punctured the lung. I asked if he remembered writing his nickname Bonzai on Ponciano's back and he said no but later he said I did not have time to put on a swastika.

Standing alone, Malanga's decisions to advance a conspiracy defense and to allow Spillman to testify during the state's case-in-chief probably would have provided a sufficient basis for concluding that defendant was denied his right to effective assistance of counsel. We need not rest our decision on these errors alone, however, because here we have more.

Malanga's preparation for trial was haphazard at best. For example, his general inattention to defendant's case is demonstrated by his failure to have some of the defense exhibits admitted into evidence before closing arguments—despite the trial court's reminder to do so. And his lack of preparation for trial is evidenced not only by his failure to interview witnesses but also by his seemingly endless requests for continuances. Yet, one of the most important indicators of Malanga's inadequate trial preparation is the motion to determine counsel filed by the state before trial. The motion outlined several ways in which Malanga's trial preparation was inadequate and concluded that "[d]ue to defense counsel's complete lack of preparation, it is

likely that a conviction would be reversed." In using the state's motion as evidence of Malanga's inadequate trial preparation, we do not wish to suggest that the state made an unwise tactical decision in filing it. To the contrary, we think that submitting the motion was precisely the correct action by the state under the circumstances.

Considering Malanga's failures as a whole, we have no trouble concluding that his performance fell outside "the range of competence demanded of attorneys in criminal cases." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, quoting *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). We have long recognized, however, that reversal is required only if "there is a reasonable probability that, but for [defense] counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Lee,* 142 Ariz. 210, 214, 689 P.2d 153, 157 (1984), quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *see also State v. Walton,* 159 Ariz. 571, 592, 769 P.2d 1017, 1038 (1989), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). "Reasonable probability" is defined as less than "more likely than not," but more than "a mere possibility." *Lee,* 142 Ariz. at 214, 689 P.2d at 157.

We find that there is more than a mere possibility that the outcome of defendant's trial would have been different but for Malanga's errors. Although we recognize that defendant's case would present a challenge to even the most competent defense attorney, Malanga's errors cannot be characterized as mere tactical blunders. This is especially true in light of the Ninth Circuit's determination that there was enough evidence in this case of a "sudden and impulsive act" that the trial court's failure to give a second-degree murder instruction warranted reversal of defendant's conviction. *Vickers v.*

*Ricketts,* 798 F.2d at 372–73. Malanga's decision to allow Spillman to testify, which resulted in Spillman's detailed account of defendant's statements just after the murder, essentially foreclosed any possibility of the jury finding defendant guilty of second-degree rather than first-degree murder. Considering this error along with those discussed above, we can only conclude that Malanga's deficient performance resulted in prejudice to the defense.[1]

In short, both prongs of the *Strickland* test have been satisfied in this case. Defendant is therefore entitled to a new trial in which he is represented by competent counsel.[2]

## II. Destruction of Physical Evidence

On February 15, 1983, more than a year and a half after this court affirmed defendant's conviction and sentence in *Vickers I,* but before the Ninth Circuit issued its decision in *Vickers v. Ricketts,* Judge Bean signed an order prepared by the clerk of the court authorizing the destruction of all physical evidence relating to the Ponciano murder. Among the items destroyed were: (1) an unknown number of white sheet strips, (2) a yellow toothbrush, (3) a bloodstained leather shoe, and (4) a bloodstained white sheet. Before defendant's retrial, defense counsel moved to dismiss the case based upon the destruction of this evidence. After hearing argument from both sides, the trial court denied the motion.

Defendant contends that the trial court erred in failing to dismiss the case against him, thereby violating his due process rights as guaranteed by both the federal and state constitutions. *See* U.S. Const. amend. XIV, § 1; Ariz. Const. art. 2, § 4. We address the merits of defendant's contention—even though its resolution is not necessary to the

---

1. Contrary to the dissent's suggestion, this is not to say that a finding of ineffective assistance is warranted whenever this court disagrees with counsel's defense strategy or finds that counsel did not present the "best" defense. Here, Malanga not only failed to present a viable defense, but also he failed to present *any* evidence that might have supported a jury verdict on second degree murder. In fact, the evidence that he

presented precluded such a verdict. It is for this reason that we find prejudice to the defense.

2. Although we do not want to punish the public for the misdeeds of a lawyer, we also do not allow seriously improper conduct to go unreported. *State v. Cornell,* 179 Ariz. 314, 331 n. 10, 878 P.2d 1352, 1369 n. 10 (1994). This matter will be reported to the State Bar.

disposition of this case—only because the issue it presents likely will be raised again on remand.

■ The crux of defendant's claim appears to be that the physical evidence in this case was never independently tested by the defense, and therefore, any potential exculpatory value it may have had was lost when the evidence was destroyed. As this court recently held in State v. Youngblood, however, "absent bad faith on the part of the state, the failure to preserve evidentiary material which could have been subjected to tests, the results of which might have exonerated the defendant, does not constitute a denial of due process of law under the Arizona Constitution." 173 Ariz. 502, 508, 844 P.2d 1152, 1158 (1993). The same analysis applies to due process challenges brought under the United States Constitution. See Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988).

■ In an attempt to circumvent this precedent, defendant argues that the "bad faith" standard enunciated in Youngblood does not apply to this case because Youngblood involved pretrial destruction of evidence, whereas this case involves post-verdict destruction of evidence. We find this argument unpersuasive.

As we previously have explained, "[t]he question is fundamental fairness. When the state exhibits bad faith in the handling of critical evidence, it is fundamentally unfair to allow the trial to proceed.... In contrast, where there is no bad faith it is fundamentally unfair to bar the state from our courts." Youngblood, 173 Ariz. at 507, 844 P.2d at 1157. We fail to see how the pretrial versus post-verdict distinction advanced by defendant bears upon this issue of fundamental fairness. Indeed, given the factual circumstances of this case, such a distinction is more imagined than real—i.e., the evidence was destroyed after the verdict in defendant's first trial, but before the verdict in his second trial. As such, we do not agree that this case requires us to depart from the principle that "only a showing of bad faith implicates due process." Youngblood, 173 Ariz. at 507, 844 P.2d at 1157.

■ Furthermore, we note that defense counsel asked for and received a Willits instruction at trial. See State v. Willits, 96 Ariz. 184, 393 P.2d 274 (1964). The jury was therefore instructed that if it found the state destroyed evidence that might have been helpful to defendant, it could infer that the evidence would have been unfavorable to the state. Willits, 96 Ariz. at 191, 393 P.2d at 278–79. "With respect to evidence which might be exculpatory, and where there is no bad faith conduct, the Willits rule more than adequately complies with the fundamental fairness component of Arizona due process." Youngblood, 173 Ariz. at 506–07, 844 P.2d at 1156–57 (emphasis supplied).

Defendant has not attempted to show that Judge Bean acted in bad faith when he signed the order authorizing the destruction of the evidence in this case, and we find no evidence of such in the record. Although Judge Bean testified that this was the only capital case in which he signed such an order and that he was not comfortable doing so, we will not infer from this any bad faith on his part. Rather, the evidence apparently was destroyed as a result of nothing more than inadvertence or neglect. We therefore hold that the trial court did not err in denying defendant's motion to dismiss the case against him.

## DISPOSITION

Because we find that defendant was denied effective assistance of counsel at trial, we reverse both his conviction and his sentence. This case is remanded to the superior court for a new trial.

MOELLER, V.C.J., concurs.

FELDMAN, Chief Justice, specially concurring:

I agree with the result reached by the court and with its analysis, except the portion that deals with the destruction of evidence. Maj. op. at 527–28, 885 P.2d at 1092–93. I write separately because I do not agree with the rule of State v. Youngblood. My reasons are set forth in my dissent in Youngblood. 173 Ariz. 502, 511–14, 844 P.2d 1152, 1161–64 (1993). However, even under my view of the

proper substantive rule, reversal was not warranted in the present case. Here, unlike *Youngblood,* the evidence that was subsequently destroyed was examined and analyzed. The results are known. Their exculpatory value, if any, can be described to the jury. Unlike Youngblood, defendant shows no prejudice. Therefore, I join in the court's holding that the trial judge did not err in denying defendant's motion to dismiss the charges.

ZLAKET, Justice, specially concurring:

I joined in the dissent in *Youngblood* and continue to question the existence of any logical connection between good faith and due process. It seems to me that a legal proceeding is either fundamentally fair or not. To the fullest extent possible, such a determination ought to be based on objective facts rather than subjective states of mind. When evidence has been destroyed, it should not matter that the destruction was innocent rather than malicious, or accidental rather than deliberate. The inquiry must focus instead on whether the defendant is able to receive a fundamentally fair trial without the evidence.

Since a majority of the court has decided otherwise, I will not belabor the point. I must, however, reaffirm my disagreement with the application of a "good faith" analysis in such situations.

In all other respects, I concur in the opinion.

MARTONE, Justice, dissenting.

I dissent. Sixteen years ago the defendant brutally murdered his cell mate. That is beyond dispute. If this were a civil case, we would direct a verdict in favor of the plaintiff and against the defendant. We affirmed his conviction 13 years ago. *State v. Vickers,* 129 Ariz. 506, 633 P.2d 315 (1981). In rejecting a claim that the evidence justified the giving of a second degree murder instruction, we said that "the evidence showed that the killing was a deliberate and reflective act and could only be first degree murder." *Id.* at 513, 633 P.2d at 322. A panel of the United States Court of Appeals for the Ninth Circuit disagreed with us on this issue and vacated the conviction in *Vickers v. Ricketts,* 798 F.2d 369 (9th Cir.1986). But even that panel had to concede "that evidence on lack of premeditation was not compelling." *Id.* at 373.

Thus, the defendant was retried, convicted, and his appeal is now before us. In the meantime, he was convicted of murdering yet another prisoner and we affirmed. *State v. Vickers,* 159 Ariz. 532, 768 P.2d 1177 (1989). So far as we know, the defendant remains under that death sentence.

But what have we here? Undoubtedly, the defendant's lawyer fell below professional standards at his second trial. The conspiracy defense was frivolous on its face. Malanga's withdrawal of the motion to suppress defendant's confession was inexplicable. But the fact remains that there was still no credible evidence of second degree murder. So counsel did not present that defense.[1] Nor does the defendant argue on appeal to us that the admission of the confession compromised his second degree murder defense. Instead, he argues that the confession sealed his fate on the first degree murder conviction. But his fate was already sealed. The overwhelming independent evidence of the defendant's guilt in this case is such that we can say beyond a reasonable doubt that defendant would have been convicted of first degree murder without the confession. Therefore, I conclude that although Malanga's performance was extraordinarily deficient, the defendant has failed to show that he was prejudiced by that deficiency as required by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (even admission of involuntary confession subject to harmless error analysis). That is to say, the defendant stood a 100% chance of

---

1. The majority finds Malanga's failure to present evidence "that might have supported a jury verdict on second degree murder" to be the "reason that we find prejudice to the defense." *Ante,* at 527 n. 1, 885 P.2d at 1092 n. 1. Thus, the majority suggests that upon remand from the Ninth Circuit, he had to present the defense which did him no good at the first trial, and which the Ninth Circuit characterized as "not compelling."

conviction of first degree murder without the confession and continued to stand a 100% chance of conviction of first degree murder with the confession. Appellate counsel for Vickers does not tell us what could have been done by competent trial counsel to make a difference.

But even if I agreed with the majority, more needs to be said about this outrageous case so that mistakes will not be repeated on retrial and so that trial judges in other cases will have some guidance on what to do when confronted by a plainly ineffective lawyer.

On May 9, 1989, the trial judge allowed Kirk V. Karman to withdraw as counsel, because Vickers "privately retained Mr. Malanga." Minute entry, May 9, 1989, at 2. Ten days later, Malanga moved to continue the trial because "[o]ver 100 witnesses must be located and interviewed." Motion to continue, May 19, 1989, at 1. On the first day of trial, the state filed a formal written motion asking the trial judge to remove Malanga as counsel because "the likelihood of any conviction being upheld is slight as Mr. Malanga has been derelict in his duties to the point of ineffective assistance." Motion to determine counsel, October 31, 1989, at 2. After outlining the depth of Malanga's failures, counsel for the state told the trial court that "the Supreme Court is going to come back, if you don't do it, in a Rule 32, they're going to come back and reverse this case." Transcript, October 31, 1989, at 28. Counsel for the state told the trial court that Malanga actually told him that he was going to interview his witnesses "on the stand." *Id.* at 31. Counsel for the state then told the trial court that "damn it, Judge, that is ineffective assistance of counsel. You can't do things like that. You have to interview these people." *Id.* And then Vickers said to the trial judge:

> Your Honor, I think Ralph here is one of the greatest attorneys in Arizona, you know, and I think Mr. Powell is scared of him. He's the one that ain't doing his homework, you know. I'm satisfied with Ralph.

*Id.* at 41.

The trial judge denied the state's motion. Minute entry of October 31, 1989.

It is rare for the state to bring an ineffectiveness claim to the attention of the trial judge. Where, as here, that happens, the trial judge will want to be especially alert to the problem. The record supports the state's claim that in this capital case, Malanga was ineffective. I am of the view that when presented with undisputed evidence of ineffective assistance, a trial judge must remove counsel and substitute adequate counsel. The judge should make the appropriate record to protect against claims that he or she interfered with the defendant's choice of counsel. I realize there is a Catch–22 aspect to this process. If counsel is removed, the defendant will argue that it is not the role of the judge to second guess his defense. If counsel is not removed, the defendant will argue that he has been denied effective assistance of counsel. But only the trial judge can make the findings that would support the correct alternative.

Finally, the initial responsibility for lawyer discipline with respect to Malanga's performance rests with the State Bar of Arizona. The court properly refers him for appropriate action. *Ante*, at 527 n. 2, 885 P.2d at 1092 n. 2. But I would do more. The people ought not to have to bear the expense of yet a third trial in an otherwise indefensible case. I would enter an order requiring Malanga to pay all fees and costs associated with the retrial of this case. I would also enter an order requiring the trial judge to appoint two competent capital defense lawyers to represent Vickers at his third trial, all as recommended by Guideline 2.1, *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* 41 (1989). The trial court should do everything in its power to ensure that the third trial is the last trial. It is time to get it right.