**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

KEVIN ARTICE MILES,
*Petitioner-Appellant*,

v.

CHARLES L. RYAN, Director,
Arizona Department of
Corrections,
*Respondent-Appellee.*

No. 10-99016

D.C. No.
4:01-cv-00645-RCC

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, District Judge, Presiding

Argued and Submitted
February 16, 2012—San Francisco, California

Filed August 27, 2012
Amended March 25, 2013

Before: Susan P. Graber, Marsha S. Berzon, and
Richard C. Tallman, Circuit Judges.

Order;
Opinion by Judge Graber;
Partial Concurrence and Partial Dissent by Judge Berzon

# SUMMARY[*]

## Habeas Corpus/Death Penalty

The panel affirmed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a capital sentence for felony murder, dangerous kidnapping and dangerous armed robbery in connection with a car-jacking. The panel held that counsel did not provide ineffective assistance during sentencing, despite petitioner Miles's claims that counsel should have focused on drug addiction as a mitigating factor, inadequately prepared the defense expert psychologist regarding Miles's drug use and mental state, and inadequately investigated Miles's social history. The panel concluded that counsel adopted a permissible sentencing strategy supported by mitigation witnesses, and that portraying Miles as a crazed drug addict with a sordid past would have contradicted that chosen strategy. The panel further concluded that, assuming that *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), applied to a petitioner who had counsel in his post-conviction relief proceeding and raised a trial ineffective assistance claim at that time, Miles would not be entitled to a remand for consideration of the above claims in light of new evidence, unless he could establish ineffective assistance of post-conviction counsel and that the trial ineffective assistance claim is a substantial one. The panel explained that the claim was not substantial merely because current counsel has now uncovered new mitigating information beyond that presented to the state court by post-conviction relief counsel.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Judge Berzon concurred in part and dissented in part. She agreed that Miles had not shown entitlement to relief based on counsel's alleged deficiencies in presenting addiction as a mitigating factor and in preparing the expert to testify. She did not agree with the conclusion that Miles is not entitled to relief based on counsel's deficient investigation of his troubled background. Because that decision was contrary to clearly established Federal law, she would review de novo and conclude that Miles's counsel was constitutionally deficient and that Miles was prejudiced as a result.

## COUNSEL

Sean Bruner, Law Office of Sean Bruner, Ltd., Tucson, Arizona; and Timothy M. Gabrielsen, Assistant Federal Public Defender, Tucson, Arizona, for Petitioner-Appellant.

Jonathan Bass, Assistant Attorney General, Criminal Appeals/Capital Litigation Section, Tucson, Arizona, for Respondent-Appellee.

## ORDER

The opinion filed on August 27, 2012, slip op. 9797, and appearing at 691 F.3d 1127, is amended as follows:

On slip opinion page 9827, replace lines 6 through 15 with the following:

> Even though Petitioner has now uncovered, during federal habeas proceedings, some new information that was not presented to the state

> courts during post-conviction review, that evidence is insufficient to demonstrate that his lawyer's investigation during the state-court proceedings was objectively unreasonable. As detailed above, his counsel conducted an extensive investigation during post-conviction review, obtaining a psychologist to perform further testing and hiring an investigator who visited Petitioner's home town and interviewed many people who knew him and his mother.

With this amendment, Judges Graber and Tallman have voted to deny Petitioner-Appellant's petition for rehearing and petition for rehearing en banc. Judge Berzon has voted to grant the petition for rehearing and petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge of the court called for a vote on whether to rehear the matter en banc. The majority of the nonrecused active judges failed to vote in favor of en banc rehearing.

Petitioner-Appellant's petition for rehearing and petition for rehearing en banc are **DENIED**. No further petitions for rehearing or for rehearing en banc shall be entertained.

**OPINION**

GRABER, Circuit Judge:

Petitioner Kevin Artice Miles appeals the district court's denial of his habeas petition, brought pursuant to 28 U.S.C. § 2254. Petitioner challenges only his capital sentence; he does not challenge his underlying felony murder conviction, arising from his role in a car-jacking.[1] Petitioner argues that his counsel was ineffective at sentencing because she failed to focus on Petitioner's drug addiction (rather than on intoxication), enlisted an unqualified expert, and failed to investigate Petitioner's social history thoroughly enough.

We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, and we affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A. The Crime

On an afternoon late in 1992, Petitioner was standing on a street corner in Tucson, Arizona, with Levi Jackson and Ray Hernandez. Jackson was carrying a pistol that the three

---

[1] Petitioner briefed several additional issues that the district court declined to certify for appeal. Most of those issues relate to sentencing, but one challenges the conviction. We have examined all the uncertified issues, and none meets the standard for granting a certificate of appealability. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (stating that a court should grant a certificate of appealability only when a habeas petitioner has demonstrated "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further" (internal quotation marks omitted)).

of them had just obtained together; he had told Petitioner and Hernandez of his plan to commit a car-jacking. Specifically, according to Petitioner's post-arrest statement to the police, Jackson had told them that he was "gonna get somebody's car, take 'em off in the middle of the desert, and shoot 'em." At the time, Jackson and Hernandez were both 16 years old. Petitioner was 24 years old.

When Patricia Baeuerlen drove up and stopped at the corner, Jackson approached her car and asked for "a light." When she turned to reach her cigarette lighter, Jackson pointed the weapon at her and told her to move over. He unlocked the car to allow Petitioner and Hernandez to enter and sit in the rear. While Jackson drove the car out to the desert, Hernandez held the pistol, but Petitioner also held it at some point. They drove Baeuerlen out of the city, into the desert, and stopped at a dirt road. There, Jackson told Baeuerlen to get out of the car and take off her shoes and jacket. She obeyed. After taunting and harassing Baeuerlen for five to ten minutes, Jackson suddenly shot her in the chest. Baeuerlen died as a result of the gunshot. According to testimony presented at trial and sentencing, Jackson—not Petitioner—shot Baeuerlen as he and Petitioner were walking away from Baeuerlen and returning to the car. Throughout the ordeal, starting with the drive to the desert, Baeuerlen was pleading for her life.

After the shooting, Jackson, Petitioner, and Hernandez drove away. According to Petitioner's post-arrest statement, he thought that Baeuerlen was still alive when they left her in the desert. No one sought help for Baeuerlen. Later the same day, Petitioner used Baeuerlen's ATM card, and a PIN that he had found in her belongings, to take money out of her bank account. The next day, Petitioner drove Baeuerlen's car to

Phoenix, where he went shopping at malls, exchanged Baeuerlen's children's Christmas presents for other goods, and went drinking with old friends. Petitioner told those friends about the murder, insisting that he did not pull the trigger, but smiling and laughing as he related the events.

## B. Arrest and Interrogation

In the early hours of the following morning, that is, the second day after the murder, police arrested Petitioner in Chandler, Arizona, following a high-speed chase in Baeuerlen's car. The police found Baeuerlen's ATM card, credit card, jewelry, and other personal items in his possession. Later that morning, Tucson detectives began a tape-recorded interrogation that lasted about five hours. During the interrogation, Petitioner initially explained his possession of the car by telling the detectives two different stories, neither of which placed him at the scene of the murder. But, after several hours of interrogation, Petitioner admitted to his involvement in the murder. Specifically, he admitted to knowing of Jackson's plan to car-jack and shoot someone, to participating in obtaining the pistol with Jackson and Hernandez, to holding the weapon at some point during the drive out to the desert, and to watching Jackson shoot Baeuerlen.

## C. Trial and Sentencing

Soon after Petitioner's arrest, Barbara Sattler was appointed as his counsel and represented him through trial and sentencing. After a jury convicted Petitioner of first-degree felony murder, dangerous kidnapping, and dangerous

armed robbery,[2] the trial court reviewed a pre-sentence report ("PSR") and held a sentencing hearing.

The PSR states that the crime occurred at around 1:30 p.m. and that Petitioner reported having used crack cocaine "four or five hours earlier" and not having slept the night before. The PSR also contains statements from Petitioner that he expected to get money from the car-jacking and that he wanted to commit another robbery with the pistol. The PSR repeats Petitioner's assertions that he did not believe that Jackson would kill Baeuerlen and that Petitioner thought that Jackson would have killed him if he had tried to stop the murder.

The social history section of the PSR contains the following information. Petitioner was adopted at the age of 4 months. His adoptive mother was an alcoholic who nevertheless maintained employment, eventually rising past jobs as a waitress and cook to become a nursing home administrator. Although Petitioner is black, his adoptive mother was white, which caused some degree of social problems; those problems grew worse when Petitioner and his mother moved to a more affluent neighborhood. Petitioner found a way to fit in by becoming a "class clown" and by playing basketball. Indeed, despite poor grades, he graduated from high school and won a basketball scholarship to a Bible college, but he dropped out of college after only a week. Petitioner later served in the Navy, where he was disciplined for substance abuse and assault before receiving an other-

---

[2] As noted, none of these convictions is at issue here.

than-honorable discharge. He also married and had a child, though he later grew apart from his wife and began using drugs. His wife eventually left him, leading him to be evicted from their apartment. A month later, his mother died, and his drug habit grew worse.

At the sentencing hearing, Sattler called an expert, Dr. Martin Levy, Ph.D., to discuss Petitioner's drug use. Dr. Levy is a clinical psychologist who had evaluated Petitioner during a two-hour session. Dr. Levy testified that Petitioner reported using crack cocaine the night before the car-jacking. In particular, Dr. Levy testified that Petitioner's "mental state was compromised by *intoxication* . . . with cocaine." (Emphasis added.) Dr. Levy also testified that Petitioner's description of his mental state during the crime suggested a state of "disassociat[ion],"[3] which was consistent with Petitioner's reported drug use.

The prosecutor objected to Dr. Levy's testimony on the ground that it lacked foundation. The sentencing judge agreed and determined that, because Dr. Levy had insufficient knowledge of when and in what quantities Petitioner used drugs, he could not testify with specificity as to Petitioner's level of impairment or judgment at the time of the crime. Nevertheless, in Sattler's closing argument, she reiterated her position that Petitioner was "under the influence of drugs and alcohol that day."

---

[3] Dr. Levy's testimony and reports use the terms "disassociation" and "dissociation" interchangeably. "Dissociation" is a "[s]eparation of psychologic experiences and events that are normally related, leading to a distortion of experience and of the meaning of personal and interpersonal events." Robert J. Campbell, M.D., *Campbell's Psychiatric Dictionary* 289 (9th ed. 2009).

Sattler focused only briefly on Petitioner's social history at sentencing. Two character witnesses testified about his background and his nonviolent nature.[4] Indeed, Sattler's closing arguments characterize him as a relatively normal person—one who graduated from high school, who usually maintained gainful employment, who served in the military and completed most of his term of service, who married, and who had a child—but who made some mistakes after his wife left and his mother died.

Ultimately, the trial judge sentenced Petitioner to death by lethal injection.[5] In so doing, the trial judge cited three aggravating factors:[6] (1) that Petitioner had previous convictions for three separate crimes of violence (armed robberies), (2) that Petitioner committed the car-jacking in pursuit of pecuniary gain, and (3) that the murder was

---

[4] In addition, Sattler planned to call Petitioner's estranged wife to testify but did not do so because Petitioner had objected. Similarly, she planned to call two other character and background witnesses, but they were unavailable because of a medical emergency. At sentencing, Sattler made a statement on the record to document those circumstances.

[5] The conviction, sentencing, and appeal to the Arizona Supreme Court all took place before the Supreme Court decided *Ring v. Arizona*, 536 U.S. 584 (2002), which requires a jury to determine all facts relating to eligibility for capital punishment. *Ring* "does not apply retroactively to cases already final on direct review." *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

[6] The trial judge relied on an additional aggravating factor—that the murder was committed in an especially heinous manner—but the Arizona Supreme Court reversed on that point. *See State v. Miles*, 918 P.2d 1028, 1035–36 (Ariz. 1996).

committed in an especially cruel manner.[7] The trial court also noted that the murder was senseless, in that it was unnecessary to the escape of Petitioner and his accomplices.

In mitigation, the trial judge rejected most of the potential mitigating factors. He rejected the contention that Petitioner was only a minor participant in the crime. The trial judge also rejected unforeseeability[8] of the murder and Petitioner's age as mitigating factors. As to expressions of remorse, the trial judge found them insincere and, in any event, outweighed by the aggravating factors listed above:

> The court finds that the defendant's expression of remorse was insufficient to outweigh the aggravating circumstances of this case. No remorse was evidenced when the defendant went to Phoenix, after the murder, in the car of Miss Baeuerlen, to party with his friends. No remorse was evidenced when the defendant was captured by the Phoenix Police. No remorse was evidenced when the defendant, a day after the murder, was able [to] laugh when detailing the murder . . . to a boyhood friend in Phoenix.

---

[7] To support the cruelty finding, the trial judge found that Baeuerlen "suffered prolonged mental anguish and uncertainty as to her fate," as demonstrated by Petitioner's own account of her "crying, screaming in terror, and begging for her life."

[8] The trial judge went on to note that Petitioner could not have been surprised by the killing in view of his accomplice's statement, before the crime, that he was "gonna get somebody's car, take 'em off in the middle of the desert, and shoot 'em."

The trial judge rejected the possibility of rehabilitation, finding no evidence to support it. He went on to note that, even if he were to find a possibility of rehabilitation, that would not outweigh the aggravating factors. The trial judge also found that Petitioner's cooperation with the police was purely self-interested and not sufficient "to establish a mitigating circumstance or to outweigh the aggravating circumstances."

The trial judge did consider mitigation arising from the nature of the murder conviction—felony murder, rather than pre-meditated murder—but found it insufficient to outweigh the aggravating factors. The trial judge also considered Petitioner's reputation for nonviolence but did not find it sufficient to outweigh the aggravating factors, especially in view of Petitioner's recent commission of three armed robberies.

Finally, of particular significance to this appeal, the trial judge rejected any drug-related mitigation, stating:

> The court finds that there is no credible evidence that the defendant's capacity was impaired or that drugs or alcohol had impaired the defendant's thinking or actions at the time of the crimes in question. . . . The testimony offered by the defendant, from Doctor Levy, Ph.D., as to impairment, was without adequate foundation, and considered by the court to be without value.

### D.  Post-Conviction Relief Proceedings

On direct appeal, the Arizona Supreme Court affirmed the conviction and capital sentence.  *State v. Miles*, 918 P.2d 1028 (Ariz. 1996).  Petitioner did not petition for certiorari to the United States Supreme Court, but he did file a state court petition for post-conviction relief ("PCR") under Rule 32 of the Arizona Rules of Criminal Procedure.  The Arizona Superior Court denied Petitioner's PCR petition, rejecting his ineffective assistance of counsel claims on the merits.  With respect to Sattler's failure to focus on addiction, the state court concluded both that Sattler's performance was not deficient and that Petitioner failed to demonstrate prejudice.  With respect to the other two claims in this case, the state court concluded only that Sattler's performance was not deficient—it made no determination as to prejudice.  The Arizona Supreme Court denied the petition for review of the PCR decision.

Before denying Petitioner's PCR petition, the Arizona Superior Court, however, ordered an evidentiary hearing.  In preparation for that hearing, Petitioner underwent more extensive psychological testing.  Dr. Joseph Geffen, Ph.D., a clinical psychologist, prepared a report describing Petitioner as using drugs to "self-medicat[e]" and as having resorted to crime because of "his perceived need for drugs without which he cannot cope."  Dr. Levy had described Petitioner's drug use similarly, as self-medication, in his pre-sentence evaluation, but did not connect Petitioner's motivation for his crimes to a need to acquire drugs.

In preparation for the state hearing, Petitioner's counsel hired an investigator to probe further into his social history.  The investigator produced a detailed report, containing

information gleaned from interviews with many people who knew Petitioner and his mother during his youth. The additional history confirms that Petitioner's mother was an alcoholic and suggests that she may also have used heroin, or at least socialized with those who did. The investigation revealed that his mother worked as a prostitute and perhaps ran her own whorehouse out of her home. When Petitioner was approximately 11 years old, his mother began work at a nursing home (and may have given up prostitution); there, she rose to become an administrator, a position she held until Petitioner's last year of high school, when she was fired for drinking on the job. Additionally, the report characterized Petitioner's hometown of Winslow, Arizona, as being segregated, corrupt, and rife with prostitution, crime, drugs, and gambling. The investigation confirmed that Petitioner and his mother suffered at least some alienation due to their mixed-race household.

The additional social history also suggests that Petitioner's mother was an "extremely protective mother" who made him the center of her life. She was "infatuated" with her son and "coddle[d]" him. She slept in the same bed as Petitioner until he was 14 years old. She "read to him constantly and sang to him when she fed him," past an age considered "normal" by a friend. The additional social history reveals that, although Petitioner's mother disciplined him by spanking him with a hairbrush when he was 4 or 5 years old, she later discontinued the practice and did not physically abuse him.[9] She bought Petitioner "everything he

---

[9] Petitioner now disputes this finding and recently filed an affidavit stating that his mother routinely physically abused him when he was between the ages of 4 and 14 years old by beating him with "belts, extension cords, paddles, switches, and her fists." Because this evidence

wanted" and, when he developed buck teeth, for which other children teased him, she arranged for him to get braces.

The additional social history report went on to discuss Petitioner's relationships with his community. He went to church twice a week for Bible study until at least his junior high school years, receiving a ride from a local bus ministry. When he was in junior high school, his basketball coach frequently drove him home from practices. He became good friends with a local family, spending a great deal of time at their home; indeed, they treated him like their own child. Notably, he remained in contact with members of that family well into adulthood—two of them were character witnesses at his sentencing hearing. According to those two witnesses, Petitioner stayed in touch with them after leaving Winslow and visited them to introduce his wife. One of the witnesses was a close friend when she and Petitioner were both living in Tucson; she was present for the birth of his daughter.

The additional social history investigation also looked into Petitioner's high school years, during which he played on the basketball team and earned a varsity letter in his senior year, helping to win the state championship. He had a close-knit group of five friends, and he was popular with girls.

## E. Federal Habeas Proceedings

In late 2001, Petitioner filed this habeas corpus petition pursuant to 28 U.S.C. § 2254. The district court granted

---

was not before the state court, however, we may not consider it. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (holding that "review under [28 U.S.C.] § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits").

Petitioner's request for appointment of an investigator and a doctor, and the court later granted requests for more funds for mitigation specialists.

Under the district court's order, Dr. Geffen, who had examined Petitioner during the state post-conviction proceedings, examined him again and prepared another report. In his report, Dr. Geffen stated that, after learning about "modern methods of evaluating mitigation factors in death penalty cases," years after his initial evaluation of Petitioner, he thought that he "had not done as complete an evaluation as possible." Dr. Geffen further concluded: (1) that Petitioner was "experiencing an altered state of mind at the time of [Baeuerlen's] murder;" (2) that, "[a]lthough physically present, [Petitioner] was emotionally and mentally 'not there' in terms of his awareness and appreciation of events around him, due to a dissociative state of mind, during which the event appeared to him as unreal and disconnected from him;" (3) that Petitioner's "substance abuse at the time was part of a lifelong adjustment problem which resulted in a severe state of depression, and that the drugs served the purpose of numbing his perceptions after some catastrophic losses and personal failures, including the loss of his mother and of his marriage and family and job, almost simultaneously, rather than being an isolated recreational act;" and (4) that Petitioner's "altered mental state met the criteria for statutory mitigation, since he was not capable of conforming to the lawful requirements due to his impaired mental state."

Around the same time, Petitioner was also examined by Dr. Wm. Michael Cochran, M.D. Dr. Cochran concluded that, "at the time of his participation in the crime(s) on December 7, 1992, [Petitioner] was using alcohol, crack

cocaine and marijuana addictively" and that Petitioner's "participation in the robbery of [] Baeuerlen was primarily motivated by his addictions, and their consequent monetary obligations to satisfy the attendant 'needs' for continued use."[10]

In 2004, the district court granted, in part, Petitioner's motion for an evidentiary hearing by allowing depositions of Sattler and Phyllis Howell (Sattler's trial investigator). But the district court ultimately determined that an evidentiary hearing was "neither warranted nor required because Petitioner ha[d] not alleged facts which, if proved, would entitle him to relief." The district court then denied Petitioner's petition, certifying only the issues discussed in this opinion. Petitioner timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 2253. After oral argument and submission of the case, the Supreme Court issued its decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and we ordered supplemental briefing to address the effect, if any, of *Martinez* on the certified issues in this case.

## STANDARDS OF REVIEW

We review de novo a district court's denial of habeas corpus relief. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

Our review of the underlying state court decisions, on the other hand, is more limited. Because Petitioner filed his § 2254 habeas petition after April 24, 1996, his petition is

---

[10] After *Pinholster*, the AEDPA standard of review prevents us from relying on Dr. Cochran's report or Dr. Geffen's last report because the state court did not consider that evidence.

governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004). Under AEDPA, we must defer to a state court's decision with respect to any claim that was adjudicated on the merits unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), a state court's decision involves an "unreasonable application" of clearly established federal law if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Holland v. Jackson*, 542 U.S. 649, 652 (2004) (per curiam) (internal quotation marks omitted).

## DISCUSSION

When applying AEDPA's standards, we review the "last reasoned decision" by a state court addressing the issue at hand. *Robinson*, 360 F.3d at 1055 (internal quotation marks omitted). Here, the last reasoned opinion addressing the claims presently before us—whether counsel performed

ineffectively at sentencing—is the Arizona Superior Court's Minute Entry, which denied Petitioner's PCR petition.

Clearly established Supreme Court precedent provides a framework for examining Sixth Amendment ineffective assistance of counsel claims. *See Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance of counsel under *Strickland*, a prisoner must demonstrate *both*: (1) that counsel's performance was deficient, *and* (2) that the deficient performance prejudiced his defense. *Id.* at 688–93. We may address these prongs in whichever order we deem most efficient. *Id.* at 697.

The first prong of the *Strickland* test—deficient performance—requires a showing that counsel's performance "fell below an objective standard of reasonableness," *id.* at 688, or was "outside the wide range of professionally competent assistance," *id.* at 690. The test is "highly deferential," evaluating the challenged conduct from counsel's perspective at the time in issue. *Id.* at 689. This inquiry should "begin with the premise that 'under the circumstances, the challenged action[s] might be considered sound trial strategy.'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1404 (2011) (alteration in original) (quoting *Strickland*, 466 U.S. at 689), *rev'g Pinholster v. Ayers*, 590 F.3d 651 (9th Cir. 2009) (en banc). Under this objective approach, we are required "to affirmatively entertain" the range of possible reasons counsel might have proceeded as he or she did. *Id.* at 1407.

The second prong of the *Strickland* test—prejudice —requires the petitioner to demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." 466 U.S. at

694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Further, as with any claim of constitutional error in a federal habeas case applied to state prisoners, an additional, essentially overlapping, harmless error standard applies: "whether the constitutional error 'had substantial and injurious effect or influence in determining the [outcome].'" *Ybarra v. McDaniel*, 656 F.3d 984, 995 (9th Cir. 2011) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)), *petition for cert. filed*, ___ U.S.L.W. ___ (U.S. May 29, 2012) (No. 11-10652).

The state court applied *Strickland*—the correct rule—in analyzing Petitioner's claims.[11]  On habeas review, Petitioner's claims amount to a contention that the state court misapplied *Strickland*, so those claims fall squarely under § 2254(d)(1). *See Knowles v. Mirzayance*, 129 S. Ct. 1411, 1414–15 (2009) (evaluating an ineffective assistance of counsel claim under § 2254(d)(1)); *Cheney v. Washington*, 614 F.3d 987, 990 (9th Cir. 2010) (same).

Our review of an ineffective assistance of counsel claim under § 2254(d)(1) and *Strickland* is "doubly deferential." *Knowles*, 129 S. Ct. at 1420.  The issue "is not whether [we] believe[] the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Id.* (internal quotation marks omitted).

---

[11] The state court identified the *Strickland* legal standard without citing that particular case; rather, the state court cited only Arizona Supreme Court decisions.  But those state court decisions, in turn, explicitly cite and adopt *Strickland*. *See State v. Vickers*, 885 P.2d 1086, 1090 (Ariz. 1994); *State v. Nash*, 694 P.2d 222, 227 (Ariz. 1985).

With that framework in mind, we evaluate Petitioner's claims.

## A.  Addiction as a Mitigating Factor

Petitioner first argues that, during sentencing, Sattler unreasonably failed to focus on his drug addiction.  We disagree.  Sattler's decision to rely on Dr. Levy and to focus on other mitigating factors, such as depression, rather than on addiction, was a matter of strategy.[12]  Sattler's arguments at sentencing support our conclusion.  Her chosen tack—characterizing Petitioner as a relatively normal person who was suffering from depression—evinces a desire to avoid painting Petitioner as a drug addict.  At the very least, Sattler's argument at sentencing raises the possibility that she was motivated by such a strategy, which is all that *Pinholster* requires.  131 S. Ct. at 1404–07.  Because Sattler's decision not to focus on drug addiction appears to have been motivated by reasonable strategic concerns, that decision is deserving of great deference under *Strickland* and *Pinholster*.  *See Turner v. Calderon*, 281 F.3d 851, 876 (9th Cir. 2002) ("The choice of what type of expert to use is one of trial strategy and deserves 'a heavy measure of deference.'" (quoting *Strickland*'s statement regarding deference due to counsel's investigative decisions, 466 U.S. at 691)).

Petitioner also argues that Sattler's representation was deficient because her sentencing arguments discussed

---

[12] Sattler's deposition supports our conclusion, but after *Pinholster*, we may not consider that evidence under the AEDPA standard of review. 131 S. Ct. at 1400 ("[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review.").  Accordingly, we do not rely on Sattler's deposition.

*intoxication* rather than *addiction*. Sattler's decision to avoid asserting that Petitioner suffered from an addiction, while focusing instead on lingering intoxication from the use of crack cocaine, could be seen as inconsistent with a strategy of painting Petitioner as a normal person; if counsel thought that drug use made Petitioner appear less deserving of sympathy, one might think that she would have tried to avoid mentioning drugs at all. But counsel's strategy and decision are reasonable when viewed from her perspective at the time of trial, as *Strickland* requires us to do. Petitioner discussed his crack cocaine use in his confession, and it was mentioned in the PSR, so Sattler had to address it somehow.

Moreover, Petitioner was sentenced in 1993. As recently as 1998, the Arizona Supreme Court was routinely rejecting addiction as a mitigating factor unless the defendant could show intoxication at the time of the crime. *See, e.g., State v. Greene*, 967 P.2d 106, 117 (Ariz. 1998) ("To hold that a motivation to kill fueled in part by a desire for drugs is mitigating would be anomalous indeed."); *State v. Williams*, 904 P.2d 437, 453 (Ariz. 1995) ("Without a showing of some impairment at the time of the offense, drug use cannot be a mitigating circumstance of any kind." (citing *State v. White*, 815 P.2d 869, 882 (Ariz. 1991))); *State v. Wood*, 881 P.2d 1158, 1176 (Ariz. 1994) ("We further believe Defendant's impulsive personality and history of substance abuse merit little, if any, independent consideration in mitigation. As noted, Defendant *was not under the influence of any intoxicating substance at the time of the murders*." (emphasis added) (citing *State v. Bible*, 858 P.2d 1152, 1209 (Ariz. 1993))). *But see State v. Gallegos*, 870 P.2d 1097, 1113–15 (Ariz. 1994) (finding error in trial court's failure to consider history of substance abuse as a nonstatutory mitigating

factor). For that reason, too, counsel would have had to emphasize intoxication.

It was only recently, in 2010, that we disapproved the Arizona Supreme Court's treatment of addiction, in a habeas review of *Williams*, 904 P.2d 437. *Williams v. Ryan*, 623 F.3d 1258, 1270 (9th Cir. 2010). Given the state of Arizona law at the time of trial, Sattler would have been operating under the assumption that intoxication was the only viable means of explaining Petitioner's drug use to the sentencing judge. And the evidence did not rule out some sort of lingering intoxication—Dr. Levy discussed it in his report.[13] Seen from this perspective, Sattler's strategy did not fall outside the wide range of professional competence or below an objective standard of reasonableness.[14]

Even if Sattler had been deficient in failing to focus on addiction, we see no prejudice, the second prong of the

---

[13] Dr. Levy's report discusses Petitioner's condition at the time of the crime as "coming down" from crack cocaine use the previous night and notes that Petitioner was dissociated from the events. At trial, Dr. Levy testified that this state is common among drug users.

[14] To be sure, in *Williams*, we wrote: "The decision of the Arizona Supreme Court that drug use could not be considered as a mitigating factor 'of any kind,' is contrary to the Supreme Court's consistent decisions in capital cases *beginning more than a decade before Williams' [1992] trial*." 623 F.3d at 1270 (emphasis added). Nevertheless, as Petitioner's brief acknowledges, under *Arizona* law at the time of his trial, addiction was not a recognized form of mitigation. Thus, although she could have relied on existing United States Supreme Court decisions to challenge the Arizona practice of ignoring the mitigating value of addiction, her strategy merits deference under *Strickland*.

*Strickland* standard. In assessing prejudice, we consider the mitigating effect of Petitioner's drug addiction and how it would have altered the balancing of aggravating and mitigating factors discussed at sentencing. *See Porter v. McCollum*, 130 S. Ct. 447, 453–54 (2009) (per curiam) ("To assess th[e] probability [of a different sentence], we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." (internal quotation marks omitted) (brackets omitted)).

As noted above, Petitioner's case involved significant aggravating factors, none of which would be affected by addiction. For many of the proposed mitigating factors (remorse, rehabilitation, cooperation), the trial judge made two findings—(1) that the evidence was insufficient to establish the mitigating factor in the first place; and (2) that even if the mitigating factor were established, it would be insufficient to outweigh the aggravating factors. It is highly unlikely that a finding of addiction as a mitigating factor would have tipped the scales where none of the other proposed mitigators did. Indeed, addiction could be characterized as merely another element of social history, which the sentencing judge considered and found insufficient to outweigh the aggravators. As stated by the district court:

> The sentencing judge considered Petitioner's life circumstances but found them insufficient to warrant leniency. There is no reasonable probability that focusing on Petitioner's crack cocaine addiction, as opposed to the reasons that led to the addiction, would have changed the sentencing outcome.

Under AEDPA, the state court's decision denying this portion of Petitioner's ineffective assistance claim must stand. The state court did not apply *Strickland* unreasonably. *See Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) ("A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."); *cf. id.* at 789 ("Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach. It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it." (internal quotation marks omitted)).

"Surmounting *Strickland*'s high bar is never an easy task." *Id.* at 788 (internal quotation marks omitted). Because Sattler's decision not to focus on addiction as a mitigating factor was strategic and because Petitioner was not prejudiced as a result, he fails to meet the *Strickland* standard here.

## B.  Qualifications of Expert

Petitioner next argues that Sattler's preparation of Dr. Levy was deficient. The sentencing court did not allow Dr. Levy to testify as to Petitioner's drug use because of a lack of foundation—Dr. Levy did not know how often Petitioner had been using drugs, or in what quantities. He did not even know if, or for how long, Petitioner had slept between the time he ingested drugs and the time he committed the crime.

Although Sattler's strategy—to focus on intoxication rather than addiction—was reasonable, she may have failed to implement it appropriately. But even if that failure

represents performance so deficient as to meet the standards
applicable when we review a *Strickland* claim under
AEDPA—a question we do not decide—Petitioner still fails
to demonstrate prejudice.  On this point, the state court made
no determination on the merits, so we must review de novo.
*See Porter*, 130 S. Ct. at 452 ("Because the state court did not
decide whether Porter's counsel was deficient, we review this
element of Porter's *Strickland* claim *de novo*.").
Significantly, the sentencing judge was aware of Petitioner's
drug use—the PSR, which quoted some of Dr. Levy's
opinions, contained information about Petitioner's "coming
down" from crack cocaine used the night before the crime, as
well as a diagnosis that Petitioner was in a "disassociated"
state.  The excluded testimony would have added very little
more.

Furthermore, as the district court noted, even if Dr. Levy
could have testified as to the effect of Petitioner's drug use on
his mental state, that testimony would have been of limited
value in view of:  (1) Petitioner's "acknowledgment that he
was not under the influence of drugs or alcohol at the time of
the offense"; and (2) Dr. Levy's other testimony that
"regardless of his drug abuse Petitioner knew the difference
between right and wrong and was capable of walking away
from the offense, thus negating any finding of significant
impairment under A.R.S. § 13-703(G)(1)."[15]    It is not
reasonably probable that Dr. Levy's excluded testimony
would have influenced the sentencing judge because, even if
the judge had considered Petitioner's drug use to be a form of
reduced, nonstatutory intoxication, the mitigating effect of
that condition would have been insufficient to outweigh the

---

[15] Section 13-703 (1993) has since been renumbered as Arizona Revised
Statutes section 13-751 (2011).

aggravating factors outlined and discussed above. Consequently, Petitioner's ineffective assistance of counsel claim, regarding the qualifications of Dr. Levy, fails on the prejudice prong of *Strickland*, reviewed de novo.

### C. Investigation of Social History

Finally, Petitioner argues that Sattler's performance was deficient because she failed to investigate mitigating circumstances thoroughly enough. *Strickland* itself involved a claim of ineffective assistance for failure to investigate mitigating circumstances. For that reason, *Strickland* is an especially good starting point for analyzing Petitioner's claim that Sattler failed to investigate sufficiently his social history. The Supreme Court outlined the standards governing counsel's duty to investigate as follows:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to *make a reasonable decision that makes particular investigations unnecessary*. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

> . . . And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Strickland*, 466 U.S. at 690-91 (emphasis added).

In *Pinholster*, the Supreme Court provided more guidance, overturning an opinion in which we had drawn, from other recent Supreme Court cases, a "constitutional duty to investigate, and the principle that it is prima facie ineffective assistance for counsel to abandon their investigation of the petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 131 S. Ct. at 1406 (citation, internal quotation marks, and brackets omitted). In the decision that *Pinholster* reversed, we had explained that we "could not 'lightly disregard' a failure to introduce evidence of 'excruciating life history' or 'nightmarish childhood.'" *Id.* (quoting *Pinholster*, 590 F.3d at 684).

In reversing us, the Court in *Pinholster* explained *Strickland*:

> "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions . . . ." *Strickland* itself rejected the notion that the same investigation will be required in every case. It is "[r]are" that

> constitutionally competent representation will
> require "any one technique or approach."

*Id.* at 1406–07 (alteration in original) (citations omitted) (quoting *Strickland*, 466 U.S. at 688–89, 691, and *Richter*, 131 S. Ct. at 788-89).

Here, Sattler's actions are a reasonable implementation of her strategy—made explicit in her closing arguments at sentencing—to characterize Petitioner as a relatively normal person who made serious mistakes after his wife left and his mother died. *Cf. Strickland*, 466 U.S. at 672–74 (finding that counsel's strategy—claiming "no significant history of criminal activity" and arguing that the defendant "should be spared death . . . because [he] was fundamentally a good person who had briefly gone badly wrong in extremely stressful circumstances" arising from "his inability to support his family"—was professionally reasonable, justifying a failure to investigate and present background information that might undermine those claims).

Sattler's failure to investigate more thoroughly is justified, then, by the irrelevance of additional social history to her chosen strategy. As *Pinholster* recognized, choice of a particular strategy can make "particular investigations unnecessary." 131 S. Ct. at 1407; *see id.* at 1407–08 (approving of the notion that " '"humanizing" the defendant . . . may be the wrong tactic in some cases because experienced lawyers conclude that the [sentencing authority] simply won't buy it'" (quoting *Pinholster*, 590 F.3d at 692 (Kozinski, C.J., dissenting)).

Because Sattler's actions reflect a deliberate choice of reasonable strategy, they do not fall outside reasonable

professional norms. We see no deficient performance in
Sattler's decision not to investigate Petitioner's social history
further, and AEDPA deference applies. It is on this holding
that we part ways with the dissent. The dissent rests on the
premise that the Arizona Superior Court's holding—that
Sattler's approach to mitigation was not deficient—was
"contrary to" clearly established federal law and that, as a
result, we should review Petitioner's ineffective assistance of
counsel claim de novo, not with AEDPA deference. That
argument is flawed because it overreads *Rompilla v. Beard*,
545 U.S. 374 (2005), and *Wiggins v. Smith*, 539 U.S. 510
(2003), in contravention of *Pinholster*'s clear instructions to
the contrary. *See* 131 S. Ct. at 1406–07 ("The Court of
Appeals erred in attributing strict rules to this Court's recent
case law." (citing *Rompilla* and *Wiggins*)). Indeed, the
dissent here appears to be making the same argument made
by the dissent in *Pinholster*, an argument that was necessarily
rejected by a majority of the Court. *See id.* at 1427
(Sotomayor, J., dissenting) ("In reaching this conclusion, the
majority commits the same *Strickland* error that we corrected,
applying § 2254(d)(1), in *Wiggins*: It holds a purportedly
'tactical judgment' to be reasonable without assessing 'the
adequacy of the investigatio[n] supporting [that]
judgmen[t].'" (alterations in original) (quoting *Wiggins*,
539 U.S. at 521)).

Further, to the extent that the dissent finds support in
*Porter*, 130 S. Ct. 447, that case is distinguishable. *Porter*
held that the defendant "may have been fatalistic or
uncooperative, but that [did] not obviate the need for defense
counsel to conduct *some* sort of mitigation investigation."
*Porter*, 130 S. Ct. at 453. In *Porter*, counsel failed to conduct
*any* investigation into the defendant's background—he did
not interview any witnesses or request any records. *Id.* Here,

as the Arizona Superior Court held, Petitioner's failure to disclose pertinent facts about his background "guaranteed that [Sattler] would not and Dr. Levy certainly would not, conduct *further* investigation into Petitioner's background." Sattler did conduct a mitigation investigation—she engaged an investigator who interviewed childhood friends of Petitioner, attempted to call his wife to testify at the penalty phase (but Petitioner refused to allow her to do so), and engaged Dr. Levy. *Porter*, therefore, is inapplicable here.

But even if Sattler's performance had been deficient, Petitioner suffered no prejudice. As with Petitioner's claim regarding Sattler's expert, the state court made no prejudice finding on the failure to investigate claim, so we must review prejudice de novo. That review is not subject to the evidentiary limitations announced in *Pinholster*, though it is subject to the limitations in § 2254(e)(2). *See Pinholster*, 131 S. Ct. at 1401 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief. . . . At a minimum, therefore, § 2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court."). But even assuming that § 2254(e)(2) permits us to consider the new evidence that Petitioner produced at the district court,[16] we see no prejudice.

---

[16] Even under review de novo and § 2254(e)(2), however, we do not consider the new evidence produced on appeal in connection with the supplemental briefing on the *Martinez* issue discussed below. *See United States v. Waters*, 627 F.3d 345, 355 n.3 (9th Cir. 2010) ("Facts not presented to the district court are not part of the record on appeal." (internal quotation marks omitted)).

First, as discussed above, Petitioner received a capital sentence primarily on account of three aggravating factors—previous convictions for three armed robberies, committing the car-jacking in pursuit of pecuniary gain, and committing the murder in an especially cruel manner—and the sentencing judge observed that the aggravators were unlikely to be outweighed by anything less than *substantial* mitigation. Petitioner's additional social history is, as the district court noted, largely cumulative of what was already before the sentencing judge in the PSR, meaning that its mitigating value would be marginal.

More significantly, the additional social history is equivocal, and not as alarming as that of the defendants in other failure-to-investigate cases. *See, e.g., James v. Ryan*, 679 F.3d 780 (9th Cir. 2012), *petition for cert. filed*, 81 U.S.L.W. 3047 (U.S. June 28, 2012) (No. 11A1119). Petitioner's mother was a prostitute during his early years, though she turned to legitimate employment when he was about 11 years old. He may have observed—but did not experience—violence in connection with his mother's prostitution. But, however problematic were the circumstances of Petitioner's mother's lifestyle, she did not neglect him, and there was no evidence that he was ever abused. To the contrary, Petitioner's mother was clearly quite devoted to him. Moreover, whatever other problems existed in Petitioner's hometown, he had a community of friends and a support system there, with responsible adults who took an interest in him. He developed healthy relationships that continued into adulthood. Finally, by all objective indications, he was socially well adjusted in high school.

Petitioner's background was far more stable than, say, the background of the defendant in *James*, in which we granted habeas relief from a capital sentence.[17]  The defendant in that case, James, grew up in a household with a father who shot heroin in front of James and was a violent alcoholic who beat James' mother.  *James*, 679 F.3d at 811.  James grew up on welfare and was both neglected and verbally abused by his mother.  *Id.*  Later, his mother took up with another violent alcoholic, but this one abused James as well as his mother.  *Id.*  Growing up, James was frequently visited by an uncle known to have sexually abused other children in his family.  *Id.* at 811–12.  At one point, James' mother tried to smother him with a pillow but relented at the last moment.  *Id.* at 812.  After living in various foster homes and an adoption center for six to nine months, James was given up for adoption at age 4.  *Id.*  He was eventually adopted by an older couple who physically abused him when he misbehaved.[18]  *Id.* at 812–13.

Similarly, the Arizona Supreme Court reversed a death sentence in *State v. Trostle*, 951 P.2d 869 (Ariz. 1997).  Unlike Petitioner here, Trostle had been neglected as a baby.

---

[17] *James* is distinguishable on the deficiency-of-performance prong of *Strickland* because, in *James*, the state did not dispute deficient performance.  679 F.3d at 807.  Also, the state court in *James* had denied the ineffective assistance of counsel claim for procedural reasons, rather than on the merits, meaning that AEDPA deference did not apply.  *Id.* at 802.

[18] The dissent asserts, "[C]ontrary to the majority's account, James did not 'grow up' in the abusive circumstances described.  Instead, at age four, James was adopted by parents who were strict but loving, and his life circumstances from thence forward took a dramatic turn for the better."  Dissent at 49.  But James' adoptive father was so "strict" that, "[o]n one occasion, [he] whipped James so severely with a rope that he raised bloody welts all over James's back."  *James*, 679 F.3d at 813.

Child Protective Services received numerous reports about him, starting with a report that he was found, at the age of 2 or 3 months old, sleeping in his own vomit while wearing a soiled diaper. *Id.* at 884. "His grandmother beat him regularly and once severely burned him with hot water for wetting his pants. His grandfather was convicted of sexually molesting him over a substantial period of time beginning at age 11." *Id.* After Trostle began acting out in sexually inappropriate ways, juvenile authorities placed him in a residential treatment and educational program when he was 14 years old. *Id.*

The newly uncovered portion of Petitioner's social history simply does not have significant mitigating value in view of what was already available to the sentencing judge. Thus, even if Sattler had been professionally deficient in failing to investigate and present these additional facts, it is not reasonably probable that the outcome of the aggravation/mitigation balancing would have been different. Indeed, the new evidence does little to dispel Petitioner's later social history, in which he acted as a functioning member of society for a number of years, demonstrating a capacity to overcome the hardships that had burdened his youth.

Accordingly, the failure-to-investigate portion of Petitioner's ineffective assistance claims fails on the first prong of *Strickland*, applying AEDPA deference. We note, however, that Petitioner's claim would fail on the first prong even under de novo review. Further, as discussed above, even if Petitioner could prevail on the first prong, thereby

requiring us to review de novo on the second prong, he would fail.[19]

## D.  Effect of *Martinez*

*Martinez* does not help Petitioner.  He had the assistance of counsel in his post-conviction relief proceeding, and counsel raised a claim of ineffective assistance of trial counsel.  Assuming that *Martinez* applies in that situation, its exception is available only if Petitioner can establish that his post-conviction counsel was ineffective under the *Strickland* standard and that the "underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that . . . the claim has some merit."  132 S. Ct. at 1318.

Here, it cannot be said that Petitioner's post-conviction counsel performed his duties so incompetently as to be outside the "wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  Even though Petitioner has now uncovered, during federal habeas proceedings, some new information that was not presented to

---

[19] Petitioner argues that the state court made an error of law in suggesting that it denied this portion of his ineffective assistance of counsel claims because his social history was not "new" evidence. Because Petitioner did not raise this argument in the district court, he may not raise it for the first time on appeal. *See Scott v. Ross*, 140 F.3d 1275, 1283 (9th Cir. 1998) (identifying a general rule of waiver for issues not raised below, subject to a discretionary exception).  Even if we allowed Petitioner to raise this argument, he could gain nothing more than review de novo under the *Strickland* standard, which is itself deferential.  *See Frantz*, 533 F.3d at 737 (holding that, when "§ 2254(d)(1) is satisfied, then federal habeas courts must review the substantive constitutionality of the state custody de novo").  As noted above, the failure to investigate portion of Petitioner's ineffective assistance of counsel claims would fail even under review de novo.

the state courts during post-conviction review, that evidence is insufficient to demonstrate that his lawyer's investigation during the state-court proceedings was objectively unreasonable. As detailed above, his counsel conducted an extensive investigation during post-conviction review, obtaining a psychologist to perform further testing and hiring an investigator who visited Petitioner's home town and interviewed many people who knew him and his mother. Accordingly, Petitioner cannot demonstrate that his post-conviction counsel was ineffective.

Furthermore, even with new evidence relating to his social history and drug use, Petitioner cannot rescue the claim that his sentencing counsel was ineffective. As we have already discussed, sentencing counsel made a reasonable choice, as a matter of strategy, not to focus on social history and addiction, opting instead to paint Petitioner as a normal person who made a grave mistake during a tumultuous period in his life. Petitioner's new evidence does not establish that this choice was unreasonable.

In summary, even assuming that the *Martinez* exception applies to Petitioner's case, he cannot satisfy its requirements.

**CONCLUSION**

Petitioner's counsel adopted a permissible sentencing strategy to show: (1) that Petitioner was a nice young man who went with bad companions because he was depressed, who may have been intoxicated at the time of the crime, who was remorseful, and who was worth saving through rehabilitation; and (2) that he was just a very minor participant in the crime who was surprised by the violent turn of events. She presented mitigation witnesses to bolster this

theory. To portray him as a crazed drug addict with a sordid past would have contradicted the chosen strategy. Petitioner's arguments amount to little more than a contention that his counsel should have adopted a different strategy. Under *Strickland*, such arguments must fail, and *Martinez* does not compel a different result.

**AFFIRMED.**

BERZON, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Miles has not shown that he is entitled to relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, on the basis of his counsel's alleged deficiencies in presenting addiction as a mitigating factor and in preparing Dr. Levy to testify. I cannot agree, however, with the majority's conclusion that Miles is not entitled to relief based on his counsel's deficient investigation of his troubled background. In rejecting this claim, the state court applied *Strickland* in a way inconsistent with the holdings of several Supreme Court cases. Its decision was therefore "contrary to" clearly established Federal law, and we should conduct de novo review. On de novo review, I would conclude that Miles's counsel was constitutionally deficient and that Miles was prejudiced by this deficiency. On this point, therefore, I dissent.

## A.  AEDPA

The Arizona Superior Court rejected Miles's failure-to-investigate claim on the ground that "a Defendant must bear some responsibility to assist his or her attorney in preparing a defense [and that] an attorney should be able to rely on his/her client to bring pertinent facts to his/her attention."[1] Because this ground is "contrary to . . . clearly established Federal law," this claim should be reviewed de novo. 28 U.S.C. § 2254(d)(1); *Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir. 2008) (en banc).

*Strickland v. Washington*, 466 U.S. 668 (1984), the seminal ineffective assistance of counsel case, explained that

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . . . In particular, what investigation decisions are reasonable depends critically on such information. . . . [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

---

[1] The state court also held that Miles could not make a claim under Arizona Rule of Criminal Procedure 32.1(e) because his evidence was not "new." Post-conviction *Strickland* claims in California are brought under Rule 32.1(a), which allows post conviction relief when "[t]he conviction or sentence was in violation of the Constitution." Because the two subsections provide separate grounds for relief, the state court's discussion of Rule 32.1(e) does not bear on its *Strickland* analysis, and so it is irrelevant to this appeal.

*Id.* at 691. What *Strickland* did *not* say is that a failure to investigate claim can be dismissed out of hand whenever the defendant had information about his past and failed to provide it to his lawyer. Instead, *Strickland* stated only that competent counsel can rely to some degree, with regard to the scope of an investigation, on what the defendant *does* tell the lawyer, not on what he does not.

After *Strickland*, the Supreme Court specifically held, more than once, that an attorney's duty to investigate a defendant's background in preparation for sentencing is not circumscribed by the degree to which the defendant offers up mitigating information about his past. In *Porter v. McCollum*, for example, the court emphasized that whether a defendant is "fatalistic or uncooperative . . . does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation." 588 U.S. —, 130 S. Ct. 447, 453 (2009). And in *Rompilla v. Beard*, the Court held counsel's mitigation investigation deficient despite the defendant's "minimal" contributions and refusal to discuss his background. 545 U.S. 374, 381–82 (2005). In contrast, the Court has explained, a defendant's active *obstruction* of counsel's efforts to perform a mitigation investigation can prevent him from showing prejudice under *Strickland*. *See Schriro v. Landrigan*, 550 U.S. 465, 466 (2007). Except in that circumstance, the Court has recognized, a competent attorney would independently seek mitigation evidence rather than rely on the defendant's representations about his past.

Moreover, the ABA Guidelines in effect at the time of Miles's sentencing specified that "[t]he investigation for the preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." *See* ABA Guidelines for the

Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989). "Prevailing norms of practice as reflected in American Bar Association standards . . . are guides to determining what is reasonable . . . ." *Strickland*, 466 U.S. at 688.

The state court did recite the general, two-prong *Strickland* standard at the beginning of its opinion (under the heading "standard of review"). But then, as evidenced by the passages quoted above, the court did not apply that standard in accord with clearly established Supreme Court precedents when evaluating the substance of Miles's claim as it related to Sattler's investigation of his background. Instead, it held that there cannot be ineffective assistance of counsel—indeed, the question cannot even be litigated—if the defendant did not affirmatively inform his counsel at trial of the information he now contends should have been developed and used.

A similar sequence occurred in *Lafler v. Cooper*, in which the state court articulated the correct standard established by *Strickland* but then "fai[ed] to apply *Strickland* to assess the ineffective-assistance-of-counsel claim respondent raised," meaning that "the state court's adjudication was contrary to clearly established federal law." 132 S. Ct. 1376, 1390 (2012); *see also Premo v. Moore*, 131 S. Ct. 733, 743 (2011) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002), for the proposition that "[a] federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in our cases . . . ."). In sum, the Supreme Court has never imposed an affirmative disclosure obligation on defendants and has recognized that attorneys have an obligation to investigate mitigation

evidence regardless of whether the defendant has provided mitigating information to counsel.

The majority argues that it is wrong to "attribut[e] strict rules to [the Supreme] Court's recent case law." Maj. Op. at 30 (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1406–07 (2011)). I agree entirely. My argument is not that we should apply a bright-line rule when evaluating the performance of counsel; my argument is that the Arizona Superior Court erred by doing just that, treating the evaluation of Miles's *Strickland* claim as if it turned entirely on the fact that he could have told his lawyer about his childhood but did not do so. The Arizona Superior Court's flat statement that "an attorney should be able to rely on his/her client to bring pertinent facts to his/her attention" is thus squarely inconsistent with clearly established Supreme Court law. Miles's claim should therefore be reviewed de novo.

## B. Ineffective Assistance of Counsel

In evaluating the merits of Miles's ineffective assistance of counsel claim, I begin by comparing with some clarity and depth the facts about Miles's background known to Sattler before the sentencing hearing and the facts that came to light during his state habeas proceedings.

The record paints a fairly clear picture of what Sattler knew about Miles's background before his sentencing. Viewed next to what came out later, it wasn't much. In a detailed letter to Dr. Levy, Sattler wrote that Miles was adopted when he was two months old, and that "all the information I have received about [Miles's adoptive mother] indicates that she was very devoted to Kevin and worked very hard to give him material things as well as a great deal of love

and affection." Sattler notes that Miles moved to Winslow with his adoptive mother when he was young and then discusses his high school years, indicating that he was "well liked," "active in student activities," and that "there was never any incidence of violence in his school years that anyone is aware of." The information about Miles's pre-high school life takes up one paragraph in the letter.

After interviewing Miles, Dr. Levy wrote a letter to Sattler in which he indicated that Miles's adoptive mother "was a single parent who held a variety of jobs from professional to laborer," and that her habit of frequently changing jobs may have been due to alcoholism. Still, Dr. Levy says, Miles's "early years were described as good ones and 'pretty normal.'" The Presentence Report does not shed any additional light on Miles's childhood, repeating the assertion that his mother was an alcoholic and that "she cooked, waited tables, and worked at a convenience store, before becoming a nursing home administrator." The PSR also notes that Miles had trouble fitting in because he was black in a small Arizona town. This, then, was what Sattler knew of Miles's childhood: that he was adopted at a young age and that his adoptive mother may have been an alcoholic, but that she worked hard and provided him with an upbringing that was "pretty normal."

The investigations conducted after Miles was sentenced, which resulted in a 33-page report prepared for his state habeas proceedings, paint a very different picture, one rife with drugs, prostitution, and violence. Miles's adoptive mother, Lois, was married to a pimp named Alfred Miles, who ran a bar, restaurant, and hotel in Tulsa called El Rancho. Miles's birth mother was one of Alfred's prostitutes, and may have been a heroin addict. Both Lois and Miles's

birth mother lived in rooms at the El Rancho. Lois was terrified of Alfred and often heard him beating Miles's birth mother mercilessly, possibly while she was pregnant with Miles. Lois informally adopted Miles, and when he was two she took him and fled to Arizona, settling in Winslow.

In Winslow, Lois met Jasper Renfro, who operated a bar called the Prairie Moon, which had rooms in the back that were rented to prostitutes for $2.00. Lois began working there as a prostitute and bartender, and moved into a two-bedroom house next door. Lois and Miles slept in one room, and prostitutes turned tricks in the other. When Lois had a customer, she would ask one of the other prostitutes to watch Miles while she was occupied. Lois drank heavily, and although her fellow prostitutes insisted that none of them used drugs, a Winslow police officer who was interviewed once found heroin at the house and recalled that the women there were "all drug addicts."

Kevin Hernandez, who was Miles's age and grew up on the same block, remembered looking over the fence that faced the alley behind the Prairie Moon and seeing prostitutes having sex. He also remembered hearing gunfire on weekends. At one point during Lois and Miles's time at the house, "a girl named Charmaine shot an Indian at the house. The police followed the blood trail to the front door and tore the house apart looking for the gun.

When Miles was around 7, he and Lois moved to another house a few blocks away from the Prairie Moon. A prostitute named Connie, who lived with Lois and Miles next to the Prairie Moon and was also a heroin addict, was shot and killed about a year after Lois and Miles moved to their nearby house. Lois was trying to turn her life around at this point,

and took a job as a cook, although she may have continued working as a prostitute (her boss was a "known pimp," according to the investigator's report, and she occasionally left Miles alone at the restaurant). 1979, when Miles was around 11, Lois got a job as a dietary aide at a convalescent center. She worked there for seven years, rising to become the administrator before being fired for drinking on the job the same year Miles graduated from high school. Lois and Miles slept in the same bed until he was 14.

### 1.  Deficient Performance

The majority views Sattler's decision not to further investigate Miles's background as reasonable in light of her strategic decision to present Miles as a fundamentally normal person who had a viable chance of being rehabilitated if spared execution. While the Supreme Court has instructed us to treat with deference the strategic decisions of counsel, *see, e.g., Pinholster*, 131 S. Ct. at 1407–08, it is hard to see how Sattler could have made a reasonable strategic choice not to present the harrowing details of Miles's childhood when she knew virtually nothing about what that childhood was like. Treating this strategic decision as determinative introduces an element of circularity into the analysis: Sattler's choice not to learn about Miles's childhood was reasonable because it was part of her strategy, which she adopted because she knew nothing about Miles's childhood. As the Supreme Court has observed, "counsel's failure to uncover and present voluminous mitigating evidence at sentencing [cannot] be justified as a tactical decision . . . [where] counsel had not 'fulfilled their obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (quoting *Williams*, 529 U.S. at 396). In other words, a strategic choice is only reasonable to the extent that

"the investigation supporting [that choice] . . . *was itself reasonable*." *Wiggins*, 539 U.S. at 523 (emphasis in original). The relevant question, then, is whether Sattler's investigation "fell below an objective standard of reasonableness. . . . under prevailing professional norms." *Strickland*, 466 U.S. at 688.

Sattler's efforts to investigate Miles's background fell below prevailing professional norms. Sattler did work with an investigator in preparation for trial, but that investigator was not trained in investigating homicide cases or conducting mitigation investigations. Sattler's letters to the investigator show that Sattler was focused on finding people in Tucson who might know something about the crime, rather than on finding information about Miles's background.

Sattler did ask the investigator to interview four people from Winslow. Of these, the investigator spoke to three high school friends who knew nothing of Miles's earlier childhood. The investigator submitted the fruits of these interviews to Sattler in two "interview reports," each a single page, and no formal background report was prepared. The investigator never traveled to Winslow. When she was deposed in connection with Miles's federal habeas petition,[2] the investigator had no recollection of Miles's name or of her work on the case, and, looking over the record, she expressed surprise at how little information her investigation produced. Although Sattler knew that Miles had been adopted at an early age and that his mother was an alcoholic who had

---

[2] Because AEDPA deference does not apply to the state court's rejection of Miles's *Strickland* claim, *Pinholster* does not prevent consideration of evidence that was before the district court under § 2254(e)(2). *Pinholster*, 131 S. Ct. at 1401.

trouble holding a job, she and her investigator did nothing to find out about his pre-high school life.

In short, this was not a case in which counsel "'did spend considerable time and effort investigating avenues for mitigation.'" *Pinholster*, 131 S. Ct. at 1404 (quoting *Pinholster v. Ayers*, 590 F.3d 651, 701–02 (9th Cir. 2009) (Kozinski, J., dissenting)). The ABA guidelines in effect at the time made clear that "[t]he investigation for preparation of the sentencing phase . . . should comprise efforts to discover all reasonably available mitigating evidence." ABA Guidelines 11.4.1(C). Thus, under the prevailing professional norms at the time of Miles's sentencing, "counsel had an 'obligation to conduct a thorough investigation of the defendant's backrgound.'" *Porter*, 130 S. Ct. at 452 (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).

Like the investigations in *Porter* and *Wiggins*, Sattler's work here fell well short of the thoroughness required in capital cases. As in *Porter*, Sattler "ignored pertinent avenues for investigation of which [she] should have been aware," 130 S. Ct. at 453, i.e., Miles's life up until he entered high school. As in *Wiggins*, Sattler "abandoned [her] investigation of [Miles's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. In *Wiggins*, those sources included psychological tests, records from the Department of Social Services documenting petitioner's time in the foster system, and a one page account of petitioner's personal history contained in the presentence report. The materials available to Sattler were considerably more scant. She did not ask Dr. Levy to conduct any psychological tests, and she obtained no comparable government records concerning Miles's childhood.

Even if Miles's reticence about disclosing the details of his childhood with Sattler is taken as a factor in the deficient performance calculus (rather than *the sole* determinant, as the state court held), that reticence does not countervail Sattler's failure to investigate. After all, Miles may not have even remembered some of the circumstances of his early life, yet "early childhood trauma, even if it is not consciously remembered, may have 'catastrophic and permanent effects on those who . . . survive it.'" *James v. Ryan*, 679 F.3d 780, 815 (9th Cir. 2012) (quoting *Hamilton v. Ayers*, 583 F.3d 1100, 1132 (9th Cir. 2009)). Miles "may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation." *Porter*, 130 S. Ct. at 453 (emphasis in original) (citing *Rompilla*, 545 U.S. at 381–82). Sattler's investigation into Miles's background, particularly her failure to learn any of the disturbing facts about his early childhood, was not reasonably in line with prevailing professional norms.

## 2. Prejudice

The majority characterizes the additional information about Miles's childhood that came to light after his sentencing as "largely cumulative" of what was before the sentencing judge, and concludes that even if Sattler's representation was not constitutionally deficient, there was no "reasonable probability that, but for [Sattler's] unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. I cannot agree.

It is worth remembering how little of Miles's pre-high school life was in the record when he was sentenced. The

PSR contains two paragraphs of social history, and has this to say about Miles's childhood:

> The defendant reported his adoptive mother was an alcoholic. She cooked, waited tables, and worked at a convenience store, before becoming a nursing home administrator. He reported he was not accepted by everyone because he was black, and his mother was white. He also indicate[d] he experienced 'culture shock' when he and his mother moved into a more affluent neighborhood and attended a better school.

Dr. Levy's report, which was also before the sentencing judge, indicates that Miles's mother was an alcoholic and that racism was an issue for him, but notes that "his early years were described as good ones and 'pretty normal.'" These brief summaries are, to put it mildly, a far cry from the information that came to light later, which showed that both Miles's birth and adoptive mothers were prostitutes, that Miles's birth mother was a heroin addict and may have been beaten by her pimp while she was pregnant with him, and that Miles spent his early years living in a two bedroom brothel, surrounded by prostitution, heroin use, alcohol abuse, shootings, and even murder. To call this childhood anywhere near "pretty normal" is strange indeed. The difference between these two narratives is one of kind, not degree.

I also cannot accept the majority's view that this mitigation evidence is far milder than that in *James v. Ryan*, 679 F.3d 780. As in *James*, Miles survived a childhood rife with violence, drug use, and crime. While there is no indication that Miles was, like James, physically abused,

James was not raised by prostitutes, nor was his childhood home the scene of murders and shootings. For, contrary to the majority's account, James did not "grow up" in the abusive circumstances described. Instead, at age four, James was adopted by parents who were strict but loving, and his life circumstances from thence forward took a dramatic turn for the better. *Id.* at 812. Miles saw his situation improve somewhat as he aged, but he and his mother didn't move out of the house next to the Prairie Moon until he was seven, and his mother may have continued to work as a prostitute until he was 11. They slept in the same bed until he was 14. My point here is not to downplay the horrors faced by the young James, but to suggest that he and Miles survived conditions that were far more comparable than the majority lets on.

The relevant question, at any rate, is not whether Miles's story is better or worse than any of the sad tales that have graced the pages of the Federal Reporter, but whether there is a "reasonable probability" that he would not have been sentenced to death had it been told. *See Strickland*, 466 U.S. at 694. Notably, "it is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances." *Correll v. Ryan*, 539 F.3d 938, 951–52 (9th Cir. 2008). What is required "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing whether the new mitigation evidence creates the required "reasonable probability," *Strickland* instructs us to consider whether "the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances." *Id.* at 700.

Applying this framework shows that Miles suffered prejudice due to Sattler's deficient performance. The

aggravating factors established at sentencing were not overwhelming: The judge relied on four, one of which was later overturned by the Arizona Supreme Court. The other three were based on (1) Miles's three armed robberies, (2) the profit motive behind Miles's participation in the crime, and (3) the "especially cruel manner" in which the murder was committed, a finding based on the fear suffered by Baeuerlen during the twenty minute drive out to the desert. Against these aggravating factors, the judge considered and rejected a variety of statutory and non-statutory mitigating factors. While the judge mentioned that he had received numerous letters attesting to Miles's previously non-violent nature, he discounted the letters as irrelevant when considering the violent felon before him. There was no mention of Miles's childhood.

Given the weakness of the aggravating factors and the total absence of any mention of Miles's childhood in the judge's sentencing, the additional mitigating evidence Sattler could have uncovered is sufficient to "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[A] penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented." *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004). Here, that discrepancy was substantial. As in *Williams*, "the graphic description of [Miles's] childhood . . . might well have influenced the [judge's] appraisal of his moral culpability." 529 U.S. at 398.[3]

---

[3] Because I would reverse on the present record, I do not address whether *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), allows Miles to introduce new facts at this stage.

## C.  Conclusion

Reviewing Miles's claim de novo, it is clear that Sattler's performance was deficient, and that Miles was prejudiced by that deficiency.  Sattler could not have reasonably chosen the particular strategy she decided upon without first making a reasonable investigation into Miles's past, and the significance of the missing information is sufficient to undermine my confidence that Miles would nevertheless have been sentenced to death.  I therefore dissent.